Mary **FRANCE**, Atchuda Barkr, Patrick Hayes, Blanca Torres Hayes, James Baker, and Sandra Rivers, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

George E. **PATAKI**, in his representative Capacity as Governor of the State of New York, City of New York, and New York City Board of Elections, Defendants,

Joseph J. Dowd, Betty Weinberg Ellerin, Edwin Torres, the Supreme Court Justices Association of the City of New York, and the Association of Justices of the Supreme Court of the State of New York, Intervenor–Defendants.

Angelo Del Toro and Pilar Santiago, Plaintiffs,

v.

George Pataki, in his representative Capacity as Governor of New York, City of New York, and New York City Board of Elections, Defendants.

Nos. 92 CIV. 1144 JES, 92 CIV. 7739 JES.

United States District Court, S.D. New York.

Oct. 29, 1999.

Center for Constitutional Rights, New York City, Randolph M. Scott–McLaughlin, Efrida A. Scott–McLaughlin, of counsel, for France Plaintiffs.

Fischbein, Badillo, Wagner & Itzler, New York City, Kenneth G. Schwarz, Tyler Kandel, of counsel, for Del Toro Plaintiffs.

Elliot Spitzer, Attorney General of the State of New York, New York City, Joel Graber, Michael Melkonian, Assistant Attorney General, of counsel, for Defendant Pataki.

Michael D. Hess, Corporation Counsel of the City of New York, New York City, Joel Berger, Mario Frangiose, Assistant Corporation Counsel, Of Counsel, for Defendants City of New York and City of New York Board of Elections.

Cahill, Gordon & Reindel, New York City, Floyd Abrams, Dennis McInerny, of counsel, for Intervenor–Defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

This action is brought under Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 Mary France, Atchuda Barkr, Patrick Hayes, Blanca Torres Hayes, James Baker, and Sandra Rivers, (the "Mary France plaintiffs") and Angelo Del Toro and Pilar Santiago (the "Del Toro plaintiffs") challenge the present method of selection of New York State Supreme Court Justices in New York City. Plaintiffs contend that this system denies the Latino and African–American population of the City an equal opportunity to participate in the political process in violation of the Voting Rights Act, and seek an order directing the implementation of a single-member district nomination system.[1] After considering the parties' voluminous submissions and testimony taken over nine days, the Court finds that plaintiffs have

---

1. Both the Pre–Trial Order and the Plaintiffs' Pre–Trial Memorandum ("Pl.Pre–TM") state that the plaintiffs seek a judgment declaring that the present method of selection, nomination, and at-large election of New York Supreme Court Justices violates Section 2 of the Voting Rights Act of 1965. *See* Modified Pre–Trial Order dated May 3, 1996, at 2 ("Modified PTO"); Pl. Pre–TM at 1. Later, plaintiffs altogether abandoned their claim with respect to the actual election process, claiming that the nomination process alone violates the Voting Rights Act. *See* Plaintiffs' Post–Trial Memorandum at 5 ("Pl.Post–TM"); Plaintiffs' Reply at 1–2 ("Pl.Reply"). This permits the plaintiffs to pursue a legal theory that because the present claim involves the nomination, rather than the actual election of Supreme Court Justices, the claim is removed from the controlling authority of *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (*"Gingles"*).

failed to sustain their burden of proving by a preponderance of the evidence a Voting Rights Act violation.

## BACKGROUND

*The Electoral System*

New York State's trial court of general jurisdiction is the Supreme Court. *See* N.Y. Const. Art. VI, § 7 (McKinney 1987). Supreme Court Justices are elected from judicial districts that contain and are coterminous with one or more whole counties in the State, of which four encompass the five counties comprising New York City.[2] *See* Modified PTO at 3. The State of New York is divided into twelve judicial districts,[3] *see id.* at 3–4, and the number of Justices in each judicial district is fixed by a population formula.[4] *See* N.Y. Const. art. VI, § 6(d) (McKinney 1987); N.Y. Jud. Law § 140–a (McKinney 1983 & 1997). Candidates for Supreme Court vacancies within these districts are selected through district judicial nominating conventions rather than at-large primary elections within each judicial district. *See* Modified PTO at 4. In order to be eligible for Supreme Court nomination, the candidate must be: (1) a member of the Bar of New York, (2) in good standing, (3)

for at least 10 years at the time he or she assumes office. *See* N.Y. Const. art. VI, § 20(a) (McKinney 1987).

Elections for the Supreme Court in New York City constitute a three-step process:

(1) Organized political parties[5] within New York City elect delegates to a borough-wide judicial convention. *See* N.Y. Election Law § 6–124 (McKinney 1978 & Supp.1997). Individuals seeking election as delegates to a judicial convention are required to circulate petitions amongst enrolled party voters within their Assembly District. *See* N.Y. Elec. Law §§ 6–136(2), 2(I), (3) (McKinney 1978 & Supp.1997). The number of delegates and delegate votes in the judicial nominating conventions are allocated according to an Assembly District's share of the vote cast for governor on the particular party line in the immediately preceding election. *See id.* at § 6–124. The ethnic makeup of the convention delegates chosen from an assembly district tend to mirror the ethnic makeup of the district's population as a whole. *See* Modified PTO at 13. The delegates are then elected by the party's enrolled voters from each Assembly District contained within the judicial district.[6] *See* N.Y. Elec. Law § 6–124.

---

**2.** These four districts are coterminous with the City's boroughs: Manhattan, Brooklyn, Queens, and the Bronx. The Second Judicial District includes Staten Island and Brooklyn.

**3.** The requirements that the justices be elected and be chosen from districts including one or more whole counties have been part of the State Constitution since 1846. *See* Modified PTO at 9. At that time, the State's charter provided for eight districts. *See id.* On four different occasions, 1906, 1948, 1962, and 1981, the downstate districts were divided such that there are currently twelve districts within the entire state. *See id.* When the Municipal Court was replaced by the Civil Court, districts were grandparented into the statute. *See* Del Toro Plaintiffs Post–Trial Memorandum at 6 ("Del Toro Post–TM").

**4.** Article VI of the Constitution and State legislation create a floor and ceiling for the number of Justices allowed per district. The number of Justices per district may not exceed one for every 50,000 persons in the district (or a

final fraction of 30,000), but cannot be less than the number of Justices elected to the Court when Article VI took effect in 1962. *See* N.Y. Const. art. VI, § 6(d).

**5.** The term "organized political party" refers to a party that has garnered 50,000 votes or more for its candidate for Governor in the State's preceding gubernatorial election and has chosen to have this status. Historically, the parties that have met this requirement have been the Republican, Democratic, Conservative, Right–to–Life and Liberal Parties. *See* Modified PTO at 12.

**6.** Since the 1990 census, there are 12 Assembly Districts in the First Judicial District, 23 in the Second Judicial District, 16 in the Eleventh Judicial District, and 10 in the Twelfth Judicial District. The number of delegates chosen from each Assembly District is determined by the State Committee of each party and is required by law to be proportional to the votes cast for Governor on the par-

(2) The elected party delegates in turn nominate qualified candidates for the vacant Supreme Court seats. At the convention, whites, African–Americans, and Latinos compromise and reach a consensus on a slate of candidates that will appear on the ballot at the next election. *See* Def. Ex. RR at 14–16; Transcript of Trial dated June 11–12, 17–19, July 8, 10–11, and September 12, 1996 ("Tr.") at 1321, 1339–40; *see also* Herman Farrell Deposition ("Dep.") at 60 (County Leader for Manhattan testified that he puts together a coalition of whites and minorities which jointly support a diverse ticket of minority and non-minority candidates); Clarence Norman, Jr. Dep. at 130–32, 159–60 (Brooklyn County Leader testified that the convention process is a "congenial ... process by which we meld the votes together, to support persons for nomination to the Supreme Court"). As a result, votes at most conventions are unanimous.[7] *See* Def. Ex. RR at 13–14.

(3) The nominees of the various parties run against one another in a general election within their judicial districts. *See* Modified PTO at 4, 15. At the general election, the individual voter may vote for as few candidates as he or she chooses. *See* Tr. at 962–63. Those candidates obtaining the highest number of votes are elected. *See id.* Candidates nominated by the Democratic Party, of any race, will usually win the election in any of New York City's four judicial districts. *See id.* at 464–65, 1027.

*The Plaintiffs' Case*

On February 18, 1992, the France plaintiffs filed a complaint seeking a declaration that the present method of selection, nomination, and at-large election of New York State Supreme Court Justices in the 1st, 2nd, 11th, and 12th judicial districts in New York State violate Section 2 of the Voting Rights Act. They also sought a permanent injunction mandating that all elections for the aforementioned judicial offices be held on a single-member, subdistrict basis rather than the current system of judicial nomination and at-large elections. *See* Modified PTO 2–3.

In their Pre–Trial Memorandum, the France plaintiffs argue that because of the uniqueness of the election procedures used to select Supreme Court Justices in New York City, the test set forth by the Supreme Court to identify a Section 2 violation in *Gingles* should not be applied in rigid fashion.[8] *See* Pl. Pre–TM at 4. Instead, they propose to prove satisfaction of the seven "totality of circumstances" factors[9] identified in the original Senate report accompanying the 1983 amendment to the Voting Rights Act to show that minority voters in New York City do not have an equal opportunity to participate in the political process leading to the nomination and election of Supreme Court Justices. *See id.* at 6–10. Plaintiffs further contend that the resulting discriminatory impact undermines the State's interest in continuing the current nomination system. *See id.* at 10–11.

On October 21, 1992, the Del Toro plaintiffs filed a similar complaint seeking the same relief on behalf of Hispanic voters. On April 12, 1993, the two actions were consolidated. *See* Stipulation and Order

---

ty's line in the last preceding gubernatorial election. *See* Modified PTO at 12.

7. The one exception to this general unanimity has been the Democratic Party judicial conventions in the First Judicial District, which occasionally have seen contested floor fights for a particular nomination. *See* Modified PTO at 15.

8. The three preconditions required to establish a Section 2 violation as identified by

*Gingles* are: (1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group must be politically cohesive; and (3) the white majority must vote sufficiently as a bloc to enable it to usually defeat the minority's preferred candidate. *See* 478 U.S. at 50–51, 106 S.Ct. 2752.

9. *See infra* at 9.

dated April 12, 1993. On April 2, 1993, this Court granted plaintiffs' motion for class action certification pursuant to Fed. R.Civ.P. 23(b)(2). *See* Order dated April 2, 1993.

A bench trial commenced before this Court on June 11, 1996. Plaintiffs' case primarily consisted of expert analyses of various elections and the role of party politics in those elections. The plaintiffs' main expert, Dr. John H. Mollenkopf, analyzed election data to determine the pattern of racial bloc voting and racial polarization in New York City elections generally. *See* Tr. 123–24; Plaintiffs' Exhibit ("Pl.Ex.") 17. He then analyzed the history of party politics as it relates to the nominating conventions for Supreme Court justices, in order to review the role that party politics play in New York City. *See id.* at 124. With respect to the nominating process, he testified that there are a number of characteristics that weigh the process in favor of white candidates.

First, Mollenkopf testified that the number of delegates and delegate votes in the judicial nominating convention are allocated based on an Assembly District's share of the vote cast for Governor on the Democratic Party line in the immediately preceding election. *See id.* He claimed that since Assembly Districts comprised primarily of white voters usually have higher rates of voter turnout, they have an advantage over assembly districts consisting mainly of minority voters. *See id.* Second, Mollenkopf claimed that since most of the Supreme Court Justice races are cross-endorsed between the Democrats and the Republicans, the system resembles a de facto appointive process dominated by the county party leader of the Democratic Parties of the respective counties. *See id.* Finally, Mollenkopf explained that expansive at-large districts present the risk that there will be racial bloc voting and dilution. *See id.* at 126. As a remedy, he proposed a single-member districting plan, and an alternative plan (that he sprung on

the Court at trial) based upon current assembly districts, but noted that "there could be a broad variety of electoral schemes that would produce fairly similar results." *Id.* at 148.

Defendants' expert, Dr. Ronald E. Weber, examined a series of Supreme Court elections in New York. He testified that judicial elections in New York City are not usually contested, and as a result, it is the nomination process that determines the identity of the Justices. *See* Tr. at 957. Dr. Weber explained that the nomination process, however, is directed toward ticket balancing, which is "balancing by ethnicity and perhaps race." *Id.* at 959–60. Further, unlike the plaintiffs' expert, Dr. Weber testified that voter registration and voter turnout differences between the two minority groups in question and whites is either nonexistent or is not politically consequential. *See id.* at 983–84. Finally, the defendants presented evidence that minorities play a substantial role in the nomination and election of Supreme Court Justices as evidenced by the fact that 41 of the 152 Supreme Court justices are racial minorities (26.97 percent), including thirty African–Americans, nine Latinos, and two Asian Americans. *See* Defendants' Exhibit ("Def.Ex.") uu; Tr. at 299–301.

## DISCUSSION

*The Gingles Framework*

Section 2 of the Voting Rights Act of 1965, as amended, reads in pertinent part as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to

nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973. The Supreme Court construed this statute in its amended version for the first time in an action challenging a multi-member at-large districting scheme enacted by the North Carolina legislature. See Gingles, 478 U.S. at 34, 106 S.Ct. at 2758. The Gingles Court identified three "preconditions" to a successful challenge to multi-member districts under Section 2:(1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group must be politically cohesive and vote as a bloc; and (3) the white majority must vote sufficiently as a bloc to enable it, in the absence of special circumstances, to defeat the minority's preferred candidate. See id. at 49, 106 S.Ct. at 2766. The Supreme Court and Congress have, therefore, developed a two-part framework for analyzing voter dilution claims by minority voters. First, the Court must determine if the party asserting a Voting Rights Act violation has established by a preponderance of the evidence the three Gingles preconditions enunciated by the Supreme Court. If this threshold test is satisfied, then the Court must treat as relevant to the inquiry the additional factors Congress set forth in the Senate Judiciary Committee Report regarding Section 2 claims. See id. at 44–45, 101 S.Ct. at 2763–64.

The Senate Report accompanying the 1982 amendments to Section 2 identifies seven typical factors and two additional factors that are relevant to the Court's analysis of the totality of the circumstances. See id. at 36–37, 101 S.Ct. at 2758–59. They are intended to aid the Court in assessing whether "the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process." S.Rep. No. 417, 97th Cong., 2d Sess. at 27 (1982). The additional factors listed in the Senate Report include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder the ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals; [and]

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* at 28–29. The report also noted two other considerations that may be probative: (1) "whether there is a significant lack of responsiveness on the part of the elected officials to the particularized needs of the members of the minority group," and (2) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Id.* at 29.

■ There is no dispute that Section 2 applies to state judicial elections. *See Chisom v. Roemer,* 501 U.S. 380, 404, 111 S.Ct. 2354, 2368, 115 L.Ed.2d 348 (1991) (rejecting the notion that judges were not "representatives" within the purview of the statute); *Houston Lawyers' Ass'n v. Attorney General,* 501 U.S. 419, 423–24, 111 S.Ct. 2376, 2379–80, 115 L.Ed.2d 379 (1991). As such, plaintiffs must demonstrate the existence of all three *Gingles* preconditions, or their case automatically fails. *See Growe v. Emison,* 507 U.S. 25, 41, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) ("Unless the [*Gingles* preconditions] are established, there neither has been a wrong nor can be a remedy."); *League of United Latin American Citizens v. Clements,* 999 F.2d 831, 849 (5th Cir.1993) ("Satisfaction of these three preconditions is necessary, but not sufficient.") (internal citations and quotations omitted); *Concerned Citizens for Equality v. McDonald,* 863 F.Supp. 393, 401 (E.D.Tex.1994) ("It is now well established that failure to establish any one of the *Gingles* factors precludes a Section 2 violation.").[10] Even if the three *Gingles* preconditions are proved, however, the plaintiffs must also

establish their case under the totality of the circumstances analysis as proscribed by Congress. *See National Association For Advancement of Colored People, Inc., (NAACP) v. City of Niagara Falls, New York,* 65 F.3d 1002, 1007 (2d Cir.1995).

*The First Gingles Precondition*

■ The first precondition requires plaintiffs to demonstrate that the minority group in question is sufficiently large and geographically compact to constitute a majority in a hypothetical single-member district. *See Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766. To satisfy this criterion, plaintiffs must demonstrate that a remedy could be fashioned that would enhance the ability of minorities to elect their preferred candidates. *See id.* at 50, n. 17, 106 S.Ct. 2752. To establish this, plaintiffs introduced the testimony of Dr. Mollenkopf who proposed both a single-member and an alternative multi-member plan to replace the current election system. He testified that such plans have the potential to increase the number of minorities nominated and elected to the State Supreme Court. *See* Pl. Post–TM at 8–9; Tr. at 149–150, 169.

The defendants argue, and this Court agrees, that the plaintiffs' proffered resolution of a single-member minority district fails to illustrate minority compactness, and therefore the first *Gingles* precondition, because such a districting scheme: (1) is based upon constitutionally suspect districting criteria; (2) fails to contemplate the citizenship rates of voter groups; (3) creates severely imbalanced electoral districts that contravene the conventional one

**10.** Plaintiffs argue that some of the *Gingles* preconditions concerning racial bloc voting patterns are not relevant in the instant case. *See* Pl. Post–TM at 5. They cite *Voinovich v. Quilter,* 507 U.S. 146, 158, 113 S.Ct. 1149, 1157–58, 122 L.Ed.2d 500 (1993), for the proposition that depending upon the circumstances, the *Gingles* preconditions can be "modified or eliminated." The case at bar is distinguishable, however, because *Voinovich* was an influence-dilution case that may have necessitated the abrogation of one of the *Gin-*

*gles* factors, whereas this case is not. *See id.* Had the *Voinovich* Court been unwilling to modify the first precondition, then no influence-dilution case could have ever succeeded because "influence districts," by definition, do not have a majority of minority voters. Furthermore, the *Voinovich* Court did not have to change or amend the first *Gingles* factor because the plaintiffs failed to demonstrate the third *Gingles* precondition, so the issue went undecided. *See id.*

person/one vote analysis; and (4) fails to include any majority Asian districts.

■ Plaintiffs propose to replace the present system with much smaller, single-member districts of unequal population. *See* Pl.Ex. 17 at 22. According to Dr. Mollenkopf, the object of his districting plan is "to maximize the number of districts which have over 50% black voting age population, or over 50% black and Hispanic combined voting age population." *Id.* at 3. Race, however, cannot be the determinative factor in redistricting. The plaintiffs may not proffer a plan that is driven substantially by race, without consideration of any other factors that conventionally effect districting. *See Miller v. Johnson*, 515 U.S. 900, 910–13, 115 S.Ct. 2475, 2486–87, 132 L.Ed.2d 762 (1995); *see also Bush v. Vera*, 517 U.S. 952, 958–59, 116 S.Ct. 1941, 1951–52, 135 L.Ed.2d 248 (1996) (finding that where evidence established that race led to the neglect of traditional districting criteria such plan was unconstitutional). Accordingly, when a districting plan is predominately motivated by race, strict scrutiny applies, and the plan is unconstitutional unless its challenged features are narrowly tailored to serve a compelling state interest. *See Bush*, 517 U.S. at 959, 116 S.Ct. at 1951–52.

■ After examining both plaintiffs' expert report and listening to Dr. Mollenkopf's testimony at trial, the Court must find that plaintiffs' single-member districting plan is primarily driven by considerations of race. The goal of plaintiffs' expert report was "to maximize the number of districts which have over fifty percent black voting age population, over fifty percent Hispanic voting age population, or over fifty percent black and Hispanic combined voting age population." Pl.Ex. 17 at 3. Based upon this virtual admission in Dr. Mollenkopf's report, combined with his testimony at trial that maximizing the

number of minority districts was a "controlling criterion," Tr. at 433–34, 488, the Court is constrained to find that race was the predominant factor in the creation of his districting plan.

This conclusion is bolstered by the obvious flaw in plaintiffs' districting scheme: it creates severely imbalanced electoral districts that contravene the conventional one person/one vote analysis. Dr. Mollenkopf proposed single-member districts of a small size, with unequal population and erratic shapes to achieve the desired racial densities. For example, the districts proposed by Dr. Mollenkopf vary in population from a low of 29,308 (District 98 in Queens) to a high of 71,314 (District 99, also in Queens). *See* Pl.Ex. 17 at 58–59. Similarly, his plan suggests electoral subunits or election of Justices in the Second District of widely divergent population sizes (from 37,879 to 69,987). *See id.* at 19, 59–61. Some of the subunits proposed by Dr. Mollenkopf in Brooklyn deviate by as much as 61% (the deviation between the largest unit and the smallest unit), whereas, a 5% deviation from the mean population is considered reasonable. *See* Tr. at 663–68. This flaw in Dr. Mollenkopf's plan, creating subdistricts of widely divergent sizes to maximize the number of majority-minority districts, is strong evidence that plaintiffs' plan is impermissibly driven by considerations of race.

In addition, plaintiffs have failed to meet their burden of showing that their districting plan takes into account traditional districting criteria such as compactness, geography, and the integrity of political subdivisions.[11] *See Bush*, 517 U.S. at 959–60, 116 S.Ct. at 1952. For example, Dr. Mollenkopf testified at trial that "I was not trying to maximize compactness of the districts ... [by] any ... measure of compactness," *see* Tr. at 682, and that in his opinion "compactness is [not] a traditional districting criteria." *See id.* at

---

11. It is also interesting to note that Dr. Mollenkopf failed to include any majority Asian districts even though he concedes that Asians,

using his system of proportional representation, would be entitled to identifiable seats. *See* Tr. at 650–51.

686. Moreover, Dr. Mollenkopf testified that issues of geographical symmetry were not his concern. *See id.* at 681–82. Finally, Dr. Mollenkopf also failed to factor incumbent Supreme Court Justices or party registration into his plan. *See id.* at 672–74.

Since the Court has determined that plaintiffs' plan is impermissibly driven by considerations of race, and fails to take into account traditional districting criteria, the Court must examine whether the racial classifications embodied in plaintiffs' plan are narrowly tailored to further a compelling state interest. In so doing, the Court must decide: (1) whether compliance with the Voting Rights Act is a compelling state interest, and (2) if so, whether the criterion was narrowly tailored to achieve such compliance. *See Bush,* 517 U.S. at 959–60, 116 S.Ct. at 1951–52; *Diaz v. Silver,* 978 F.Supp. 96, 128 (E.D.N.Y.1997). Assuming that New York State has a compelling interest in avoiding liability under the Voting Rights Act Section 2, the Court must still be satisfied that plaintiffs' plan is narrowly tailored. *See Bush,* 517 U.S. at 979–80, 116 S.Ct. at 1961–62. Plaintiffs' districting plan would fail the "narrowly tailored" component of strict scrutiny analysis if the *Gingles* preconditions are not met. *See Diaz,* 978 F.Supp. at 128 (holding that if the three *Gingles* preconditions are not met, then the plan is not narrowly tailored). Since plaintiffs cannot prove the first or third *Gingles* preconditions, their plan is not narrowly tailored and cannot survive strict scrutiny analysis.

■ Other evidence presented at trial reinforces the conclusion that plaintiffs' single-member plan fails to satisfy the first *Gingles* precondition. Plaintiffs' plan failed to factor citizenship into their voter group analysis. *See* Pl.Ex. 17 at 3; Tr. at 478. The plain language of the Voting Rights Statute makes it clear that it is only concerned with the voting practices of citizens. *See* 42 U.S.C. § 1973(a). Accordingly, in Voting Rights cases, the proper measure of population is the total citizens eligible to register and vote, not the total population. *See Valdespino v. Alamo Heights Independent School Dist.,* 168 F.3d 848, 853 (5th Cir.1999); *Negron v. City of Miami Beach, Florida,* 113 F.3d 1563, 1569 (11th Cir.1997); *League of United Latin American Citizens, Council No. 4434 v. Clements,* 986 F.2d 728, 743 (5th Cir.1993) ("*L.U.L.A.C.*"); *Romero v. City of Pomona,* 883 F.2d 1418, 1426 (9th Cir.1989) ("[E]ligible minority voter population, rather than total minority population, is the appropriate measure of geographical compactness."). While recognizing that New York City contains a high-proportion of immigrants who are non-citizens who are ineligible to vote under the Voting Rights Act, plaintiffs' plan failed to take citizenship into account. *See* Tr. at 478–79. For example, while the proportion of minority residents in Queens is high, it includes a substantial number of non-citizens and family members under 18 who are ineligible to vote. *See id.* at 574; *see also* Def. Ex. T–Y (data on age, ethnicity and citizenship) and Ex. Hh (City of New York, Department of City Planning, *The Newest New Yorker: An Analysis of Immigration into New York City during the 1980's* (1992)). Dr. Mollenkopf's population figures are therefore flawed because he includes non-citizens who are ineligible to vote in his calculations.

At trial, Dr. Mollenkopf proposed an alternative multi-member districting scheme which was not based on race, but was created using the current Assembly District lines. *See* Pl. Post–TM at 8. Under this system the total number of judges elected from each judicial district would be apportioned by the number of assembly districts in each judicial district. *See id.* Consequently, 24 Justices would be elected in the Bronx to a total of 10 assembly districts, resulting in 2.4 Justices being elected from each district. *See id.* at 9. This alternative districting scheme suffers from numerous flaws: (1) Dr. Mollenkopf never explained how 2.4 Justices are to be

elected from each district, *see* Tr. at 153–54; (2) the plan assumes that justices chosen from each assembly district will "look," in racial terms, like the district's population; and (3) it appears that the number of elected African–American Justices would fall in several districts. *See id.* at 168. For instance, under the current system, there are three black justices and four Latino Justices in the Bronx. *See id.* Under the proposed multi-member plan, there would be a substantial increase in the number of Latino Justices nominated and elected in the Bronx, but there could be a slight decrease in the number of blacks. In addition, under the multi-member scheme in New York County, redistricting would result in an increase in the number of potential Latino Justices from two to six, and a decrease in the number of blacks from ten to three. *See id.* at 141, 168. This plan, therefore, has a regressive component that decreases the number of African–American Justices in certain districts.

For the above stated reasons, the Court finds that the plaintiffs have failed to meet their burden of proof in establishing the first *Gingles* precondition. In any event, even assuming that the first *Gingles* precondition had been met, plaintiffs still fail because they cannot establish the third *Gingles* precondition or the "totality of the circumstances test" discussed below.

*The Second Gingles Precondition*

The second *Gingles* factor requires the plaintiffs to show that the minority groups in question are politically cohesive. *See Gingles,* 478 U.S. at 51, 106 S.Ct. at 2766. Both plaintiffs' expert, Dr. Mollenkopf, and defendants' expert, Dr. Weber, testified that in some of the elections studied there was evidence of racial bloc voting by each minority group. *See* Tr. at 401–21, 1022, 1025, 1063–64, 1089. Dr. Weber further agreed that African–Americans were cohesive in all Supreme Court races he had studied. *See id.* at 1022. In fact, he found that not only were African–Americans and Latinos politically cohesive, but he would

also expect a majority-minority district to elect a minority justice. *See id.* at 1063–64. This evidence is undercut by Dr. Weber's explanation that African–Americans' and Latinos' cohesiveness in general elections is due to the fact that they both vote along Democratic Party lines. *See id.* at 1026–27. Moreover, flaws in Dr. Mollenkopf's single-member plan undermine the conclusion that African–American and Latino voters are cohesive when voting together. At trial, Dr. Mollenkopf admitted that black and Hispanic voters do not always support the same candidates when voting in general elections, *see id.* at 496, 501–03, and that the two groups are more likely than not to support different candidates in primary elections. *See id.* at 1100. However, on balance, the Court finds that African–American and Latino voters are politically cohesive.

*The Third Gingles Precondition*

■ The third *Gingles* precondition requires plaintiffs to prove that white-bloc voting usually defeats the minority-preferred candidate. *See Gingles,* 478 U.S. at 51, 106 S.Ct. at 2766–67. Dr. Mollenkopf attempted to demonstrate white-bloc voting by examining, not elections of Supreme Court Justices as one might expect in this case, but on exogenous elections, including the 1989 and 1993 mayoral elections. He concluded that in the elections that he examined "[w]hite voters consistently vote against minority candidates, and that this fact often prevents black[s] and Latinos from winning elections." Pl.Ex. 17 at 22; *see also* Tr. at 1032–37, 1089. However, Dr. Mollenkopf's report and trial testimony, and the conclusions drawn therein, suffer from two fatal flaws: (1) the report relies almost exclusively on exogenous elections results, a process that is not appropriate in the instant case; and (2) he draws conclusions from those exogenous elections that are belied by the record. Moreover, defendants presented evidence that demonstrated both the absence of white-bloc voting and the existence of a coalition building process in Supreme

Court nominations and elections that transcends racial boundaries. The Court will address, in turn, the major weaknesses of Mollenkopf's report and testimony, and defendants' evidence regarding the absence of white-bloc voting.

Dr. Mollenkopf did not analyze Supreme Court Justice races, see Pl.Ex. 17 at 18, rather, plaintiffs put forth evidence of racial bloc voting demonstrating that in elections for offices other than for the New York State Supreme Court, such as Mayoral contests, county-wide racial bloc voting occurs. See id. at 11–17. The plaintiffs then extrapolate from these exogenous elections that bloc voting exists which prevents minorities from succeeding more often at judicial conventions. This analysis, however, is flawed because the elections relied upon by plaintiffs' expert do not reflect the process by which Supreme Court Justices are nominated and elected. See City of Niagara Falls, 65 F.3d at 1015 n. 16. (holding in a Voting Rights challenge that "the parties, as well as the district court, focus on City Council elections. This approach makes sense, since it is the City Council elections that are being challenged"). Unlike Mayoral races, Justices are normally elected several at a time, voters are under no obligation to vote for a full slate of candidates, and for most voters, judicial elections have less importance than non-judicial elections. See Tr. at 962–65. This Court agrees with the defendants that because of the unique nature of the elections of Supreme Court Justices "it is particularly the case in New York City [and] New York State ... that you would not want to rely heavily on nonjudicial elections for the purposes of understanding judicial elections." Id. at 962; Def. Ex. C at 11–23. The nature of the election of New York Supreme Court Justices weakens the plaintiffs' comparison with nonjudicial elections.

In any event, Dr. Mollenkopf's interpretation of the exogenous elections discussed in his report stands in sharp contrast to the testimony that he gave under cross-examination at trial. In his report, Dr. Mollenkopf sought to identify racial polarization between whites, blacks and Hispanics by examining city-wide elections in which members of those groups ran against each other. See Pl.Ex. 17. With respect to elections between white and black candidates, the report concluded that there is a "high degree of racial polarization between black and white populations," see id. at 11, and that "polarization also exists, although to a lesser degree, between whites and Hispanics." Id. at 16. These conclusions, however, were severely undermined by Dr. Mollenkopf's trial testimony, including several damaging admissions that white voters do not consistently vote against minority candidates. See Tr. at 488–91; 519–25. When questioned about the 1989 Mayoral primary race between David Dinkins and Edward Koch, and the 1989 and 1993 general elections between Dinkins and Rudolph Giuliani, Dr. Mollenkopf was forced to reassess the conclusion that he reached in his report that these contests were racially polarized. Id. In fact, when pressed, Dr. Mollenkopf admitted that in each of these elections, winning candidates received substantial support from white, black and Hispanic voters.[12]  Id. Therefore, to the extent plaintiffs rely on its report on exogenous election results to support their position regarding racial polarization in city-wide elections, such results must be discounted because of Dr. Mollenkopf's inconsistent trial testimony, numerous concessions, and other flaws that weaken his testimony and the strength of the results of his report.

In addition to Dr. Weber's report regarding the absence of racial polarization

---

**12.** Another example of the absence of racial bloc voting that Dr. Mollenkopf conveniently neglected to analyze was the 1994 election of Carl McCall, an African–American Democrat, to the position of State Comptroller. When questioned about this election, Dr. Mollenkopf conceded that the election had "one of the least levels of racial polarization of any city or statewide race in recent history." Tr. at 505.

in Supreme Court elections,[13] defendants also presented Dr. Weber's testimony and other anecdotal evidence regarding the absence of racial bloc voting and the presence of a coalition building process that involves white, as well as black and Hispanic voters. Dr. Weber testified at trial that prior to an election, a coalition is built at the nominating convention to create a balanced overall ticket that will appeal to various groups. *See* Tr. at 1038–40. He explained that in order to achieve electoral success in New York City, coalitions have to be built, starting at the nomination stage, that cross racial lines. *Id.* This being so, no "white bloc" thwarts "minority" candidates. *Id.* In seeking to bolster Dr. Weber's conclusion, defendants called Justice George Freidman of the 12th Judicial District, a former member of the State Assembly and Democratic party county leader in the Bronx. Justice Friedman testified that white delegates do not vote as a bloc so as to defeat the minority delegates' preferred candidate. He stated that: "No one could come through a convention or win a primary in the Bronx with the support of only one ethnic group. You need support beyond what one group can supply to you." Tr. at 848; *see also* Tr. at 571 (Chairman Manton denying the existence of white bloc voting at conventions). Moreover, plaintiffs' own witnesses testified that the nomination and convention system necessarily involves African–Americans, Latinos and whites compromising and working together to pick a slate of candidates whose name will appear on the ballot. *See e.g.* Herman Farrell, Dep. at 60 (County leader for Manhattan testified that he puts together a coalition of whites and minorities which jointly support a diverse ticket of minority and non-minority candidates); Clarence Norman, Jr. Dep. at 130–31, 159–60 (Brooklyn County leader

testified that the convention process is a "congenial ... process by which we meld the votes together, to support person for nomination to the Supreme Court"). Based on Dr. Weber's report and testimony, and similar testimony from other witnesses, including Justice Friedman, the Court concludes that plaintiffs have failed to establish the existence of racial bloc voting in the nomination or election of Supreme Court Justices. Finally, the Court notes, that this conclusion is further reinforced by the presence of a substantial number (almost 27% all elected Justices) of African–American, Latino, and Asian–American Justices on the Supreme Court benches of the City. *See* Def. Ex. uu.

In sum, the plaintiffs' case must fail because they have not proven the first and third *Gingles* preconditions that are necessary to establish a Voting Rights Act violation. Accordingly, the Court holds that the plaintiffs have failed to sustain their burden of proof showing that the Latino and African–American populations of New York City do not have an equal opportunity to participate in the election of New York Supreme Court Justices. Alternatively, however, even if the plaintiffs had evidence of all three *Gingles* conditions (which they do not), the plaintiffs' case would still fail under the Senate's totality of the circumstances test.

*The Senate Factors—"Totality of Circumstances"*

In order for the plaintiffs to prevail, they must not only prove the three *Gingles* preconditions, but the Court must additionally find that under the "totality of the circumstances," the plaintiffs established that "its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The scope

---

**13.** Defendants' expert Dr. Weber presented a documented and undisputed analysis of 53 general-elections contests for Supreme Court Justices drawn from all of the City's four judicial districts. *See* Def. Ex. C. Dr. Weber found no evidence of vote dilution. *See id.*

He concluded that candidates preferred by African–Americans or Hispanic voters are not being defeated by cohesive white voters in the Supreme Court elections. *See* Def. Post–TM at 26.

of this inquiry is broader than the *Gingles* analysis and stems from the Act itself which states that a violation "is established if, based on the totality of circumstances, it is shown that the political process is not equally open to participation." 42 U.S.C. § 1973; *see also City of Niagara Falls,* 65 F.3d at 1019. The Senate Report accompanying the 1982 amendments to Section 2 identifies seven typical factors and two additional factors that may be relevant to the totality of the circumstances analysis. *See supra* at 323. Although the plaintiffs' case fails because they cannot prove the first and third *Gingles* preconditions, even if their case were evaluated under the totality of the circumstances, as they argue it should be, plaintiffs' case still falls far short of proving by a preponderance of the evidence a Voting Rights Act violation.

*(a) History of Official Discrimination*

The first Senate Report factor for the Court to consider is "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." S.Rep. at 28. The existence of general racial discrimination as a part of United States history is not enough to meet this factor. *See Reed v. Town of Babylon,* 914 F.Supp. 843, 885 (E.D.N.Y.1996). The plaintiffs must establish that New York City in particular has a history of official discrimination that has restricted minorities access to the political process. Dr. Abigail Thernstrom, an expert in *Reed,* reported that:

> New York has long been in the vanguard of the struggle for African-American civil rights.... As early as 1874, New York outlawed racial discrimination in public places.... In 1913 it became the first state in the nation to ban the discriminatory advertising of public facilities and accommodations.... New York also led the nation in legislation barring employment discrimination, with

a series of statutes beginning in 1909.... In 1948 New York similarly outlawed all forms of racial discrimination in the field of education as well. *Id.* at 886. Unlike jurisdictions typically involved in Voting Rights Act cases, New York has ensured African-Americans the right to vote since 1874. *See Butts v. City of New York,* 779 F.2d 141, 150 (2d Cir. 1985). In fact, New York City has taken steps to encourage minority voting including mail registration and a Registration Task Force appointed by Governor Cuomo. *See id.* Furthermore, defendants' expert, Dr. Mollenkopf, acknowledged that the election practices in question were not adopted as a part of a racist historical tradition. *See* Tr. at 456 ("The current practice long predates the arrival of large numbers of blacks or Hispanics in New York City"). Therefore, the Court concludes that there is no evidence of a history of official discrimination present in New York City affecting the African-American and Latino communities' ability to participate in the political process.

*(b) Racially Polarized Voting*

The second Senate factor is "the extent to which voting in the elections of the state or political subdivision is racially polarized." S.Rep. at 29. Racial polarization does not seem to play a significant factor in the results of Supreme Court elections, *see supra* at 15–18, rather it is the appeal of the Democratic party that drives the outcome of the elections. *See id.* Moreover, as discussed above, given the numerous flaws in plaintiffs' report, and the evidence presented by defendants regarding the absence of racial polarization, the Court concludes that this factor tilts against the plaintiffs.

*(c) Use of Voting Practice that may Enhance the Opportunity for Discrimination*

The Court must determine "the extent to which the state or political subdivision has used unusually large election districts,

majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." S.Rep. at 29. There are no discriminatory practices such as majority-vote requirements or anti-single shot provisions [14] utilized in New York City Supreme Court elections. See Tr. at 962–63. Moreover, due to various voting initiatives, the registration rates for African–Americans exceed that of the white population, and the percentage of registered Hispanics voters has risen dramatically over the past few years. See Tr. at 479, 482–83. As plaintiffs' expert conceded at trial, the absence of discriminatory voting practices and the rise in minority voter registration rates both suggest that discrimination against these two groups has not been enhanced by voting practices. See id.

Plaintiffs counter that the nominating process for Supreme Court Justices enhances the opportunity for racial discrimination. See Pl. Post T–M at 12–13. Plaintiffs complain that the practice of conducting the nominating convention on an at-large basis reduces a minority candidate's opportunity to be elected because of financial barriers associated with large election districts. See id. at 13. Moreover, plaintiffs argue that practice of apportioning the number of delegates allocated to the nominating conventions based on the number of votes cast by voters in the various assembly districts further enhances the power of leaders from white assembly districts because of greater voter turnout in those districts. See id. However, the use of at-large voting is not in and of itself dispositive of a Voting Rights Act violation. Indeed, defendants presented evidence that the current system re-

duces candidate expenses because candidates "ride along on the ticket and spend very little money." Tr. at 1167–68. Furthermore, plaintiffs cannot be heard to complain about a race-neutral system that apportions the number of delegates according to voter turnout when every racial group has an equal opportunity to participate in this system by simply voting, particularly when plaintiffs concede that there are no barriers preventing minority voters from registering and voting at the polls. See Tr. at 483, 985–86. Accordingly, the Court concludes that New York City has not used voting practices to enhance the opportunity for discrimination.

### (d) Access to the Slating Process

The fourth Senate factor is "whether members of the minority group have been denied access" to any candidate slating process. S.Rep. at 29. The key slating inquiry is whether minorities have been able to get on the ballot. See L.U.L.A.C.C., 986 F.2d at 750. Plaintiffs contend that the mechanisms by which the Democratic and other parties nominate their candidates for election to the Supreme Court involve a slating process over which the minority community has little influence. See Pl. Post–TM at 14. Plaintiffs cite the practice of ethnic designation of seats, see id. at 15–16, the unwritten requirement that candidates have prior judicial experience, see id. at 18, and the fact that minority candidates often lack the "political entree" to participate in the system, see id. at 17, as evidence of slating practices used by the Democratic Party to limit minority access to judicial elections. While plaintiffs presented some antecdotal evidence of the existence of slating practices,[15] defendants elicited testimony and

---

**14.** Single-shot voting permits a voter in an at-large voting system to exercise less than all of his or her votes, thus enhancing the significance of his or her vote. See Goosby v. Town Board of the Town of Hempstead, New York, 180 F.3d 476, 485 (2d Cir.1999); Reed, 914 F.Supp. at 849. An anti-single shot provision "forces minority voters to cast votes for white candidates whom the minority voters may not

favor, thereby increasing the vote totals of those white candidates." Westwego Citizens for Better Government v. City of Westwego, 946 F.2d 1109, 1112 (5th Cir.1991).

**15.** The Del Toro plaintiffs also complain, in addition to the other slating practices alleged by plaintiffs, that Hispanic voters do not have an equal opportunity to elect their preferred

provided evidence that suggest that blacks and Hispanics have substantial participation in the nomination and selection of candidates to the Supreme Court. *See* Farrell, Tr. at 1258, 1304–05 (describing diversity and affirmative action goals of the screening panel); Ramirez, Tr. at 1339 (discussing minority delegate participation); Norman, Tr. at 897 (describing district leaders' negotiations concerning candidates); Farrell, Tr. at 1282 (describing outreach efforts on the part of party leadership to encourage and develop minority candidates); Manton, Tr. 559 (same). Moreover, as already discussed, the defendants presented substantial and credible evidence that the nomination and election of Justices involves a coalition building process that includes all ethnic groups, including white, blacks and Hispanics. *See supra* at 19–20. As such, the Court cannot conclude that minorities do not have access to the slating process, and this conclusion is reinforced by the significant and increasing numbers of minority Supreme Court Justices. *See* Def. Ex. uu; Tr. at 299.

### (e) Socioeconomic Factors

The Court must also consider "the extent to which members of the minority group in the state or political subdivisions bear the effects of discrimination in such areas as education, employment, and health ..." S.Rep. at 29. The fifth Senate factor requires that as a result of past discrimination, African–American and Latinos suffer from lower socioeconomic conditions than whites. *See Gingles*, 478 U.S. at 69, 106 S.Ct. at 2776. Plaintiffs allege that historic discrimination against African–American and Latino residents of New York City in economic, historical, and social levels has resulted in an inequality in their participation in the political process, that African–American and Latino residents of New York City have lower socioeconomic status than their white

counterparts, bear the effects of discrimination in such areas as education, employment, and health, and also register to vote in lower numbers than their white counterparts. *See* Pl.Ex. 12. Plaintiffs, however, failed to introduce specific evidence showing such a correlation between socioeconomic factors and minority voter participation. *See* Tr. at 616–21. While plaintiffs' expert, Dr. O'Hare, addressed socioeconomic factors such as car ownership in his report, these factors have little significance in New York City. *See id.* Finally, while the Second Circuit recognized in *Niagara Falls* that African–Americans were "significantly disadvantaged" socioeconomically compared to whites, the *Niagara* court held that this did not "hinder their ability to participate effectively in the political process." The Court drew this conclusion based on the fact that there was no evidence of significant racial difference in voter registration rates. *See Niagara Falls*, 65 F.3d at 1021. Similarly, defendant presented persuasive evidence that minorities have not been excluded from participating in the political process as is evident by their climbing voter registration rates, turnout at the polls and their success in the electoral process. *See* Tr. at 481–83, 492–93. Accordingly, plaintiffs have failed to prove the fifth Senate report factor.

### (f) Overt or Subtle Racial Appeals

Congress further suggests that the Court examine "whether political campaigns have been characterized by overt or subtle racial appeals." S.Rep. at 29. In their Pre–Trial Memorandum, plaintiffs concede that the election system in question has not been characterized by "overt and subtle racial appeals." Pl. Pre–TM at 9.

### (g) Minority Group Success in Elections to Public Office

As *Gingles* emphasized, the "extent to which minority group members have been

---

candidates because of the misallocation of Civil Court judgeships. *See* Del Toro Plain-

tiffs' Reply Brief at 12.

elected to public office is one of the most important Senate Report factors." 478 U.S. at 48 n. 15, 106 S.Ct. 2752. The evidence presented by the defendants at trial clearly demonstrates that minorities have had substantial electoral success in both Supreme Court elections, but also at every level of government. Blacks and Hispanics constitute more than a quarter of the elective Supreme Court bench in New York City. See Def. Ex. uu. This is so, even as the percentage of minority lawyers meeting the eligibility requirements for nomination to the Supreme Court is substantially less than the percentage of minorities currently on the bench. See Def. Ex. Yy, Qq, aa. In addition, defendants introduced evidence that minorities also hold numerous elected positions at every level of government. See Def. Ex. O–S, ZZ(1), ZZ(2), Aa, Bb, Cc. Even plaintiffs' expert, Dr. Mollenkopf, acknowledged that minorities "have clearly not been excluded from political representation." Tr. at 723–24. Accordingly, this factor does not favor plaintiffs' case.

### (h) Other Senate Considerations

In addition to the above-mentioned factors, the 1982 Senate Report suggests that the Court may look at two additional factors in appropriate cases. These are: (1) whether there is a significant lack of responsiveness on the part of the elected officials to minority groups' "particularized needs"; and (2) "whether the policy underlying the estate or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S.Rep. at 29. When assessing responsiveness, the Second Circuit has looked to programs and efforts implemented to address the needs of the minority groups. See City of Niagara Falls, 65 F.3d at 1023 (citing government-sponsored task forces and programs as examples of responsiveness). In the case at bar, defendants demonstrated that elected officials have been responsive to

the needs of African–American and Latinos. Congressman Manton and Clarence Norman, an African–American member of the state assembly from Brooklyn and the Democratic party's Brooklyn county leader in 1990, testified that there have been voter registration drives, efforts to establish local political clubs and associations, and initiatives to add minorities to the Democratic party's county executive committee all in furtherance of the election of minorities. See Tr. at 566–67, 907–11. Mr. Norman also stated that he and the respective county leaders in the Bronx and Manhattan ensure that there is diversity in the judiciary See id. at 907–08. These types of programs and other efforts demonstrate an adequate responsiveness on the part of elected officials.

The only remaining issue for the Court to examine is New York's interest in maintaining its current system of nominating and electing Supreme Court Justices. It is well settled that a State's citizens have a substantial and legitimate interest in maintaining the link between an elected judge's territorial jurisdiction and those courts' electoral districts. See Houston Lawyers Ass'n, 501 U.S. at 426, 111 S.Ct. at 2381; Milwaukee Branch of the N.A.A.C.P. v. Thompson, 116 F.3d 1194, 1201 (7th Cir.1997) (holding that the State has a legitimate interest in maintaining the link between the sizes of the at-large electoral districts and the court's jurisdiction to ensure accountability to all the citizens and diverse groups who reside in a single judicial district); L.U.L.A.C., 999 F.2d at 876; Southern Christian Leadership Conference v. Sessions, 56 F.3d 1281 (11th Cir.1995) (same). This interest in "linkage" is based on several factors, including judicial accountability, impartiality, and the fair administration of justice. See L.U.L.A.C., 999 F.2d at 873. In the instant case, it is readily apparent that New York State has a substantial interest in maintaining the structure of judicial elections. This system is embodied in its Constitution and has been in place for over 150 years. The citizens of New York State have repeatedly reaffirmed their

commitment to the present electoral system; it was first adopted at the State's third constitutional convention in 1846, and was affirmed in the people's ratification in 1961 of the current Article VI of the State Constitution. *See* Professor LaPiana's report, *A Report on the Origins and History of the Election of Supreme Court Justices in the State of New York* (Feb. 6, 1996). Moreover, the defendants provided evidence at trial that the plaintiffs' plan would undermine the State's interests in judicial accountability and the fair administration of justice. Several witnesses testified that plaintiffs' districting plans would have the negative effect of increasing the influence of the local party leaders in the relevant districts because candidates for the bench would require their influence to get elected. *See* Tr. at 777–78, 1172–73; Def. Ex. AA at 100–01. For instance, plaintiffs' witness, Justice Charles Ramos, testified that the smaller districts proposed by plaintiffs would be a "disaster" because "judges would be appointed by the district leader . . . [and] at the end of [a judge's] term the district leader would be the one to determine who will succeed or who will be reelected." *Id.* at 778. Justice Ramos further explained that the system would become extremely competitive and that such a system would "raise the specter of direct corruption." *Id.* Other testimony offered by defendants demonstrated the real risk that plaintiffs' plan would lead to an increase in the number of politicized races and heighten the importance of money in the process. *See* Tr. at 1167, 1312; Def. Ex. AA at 100–01.

In all, the current system insures that Justices are accountable to their entire constituency whose affairs they adjudicate. *See L.U.L.A.C.*, 999 F.2d at 873 (recognizing a State's historic interest in having district judges remain accountable to all voters). Furthermore, smaller districts, as proposed by plaintiffs, would lead to more expenses, necessitate additional fund raising and increase politicization of judicial races. *See* Tr. at 229, 1167. Finally, given the Court's prior conclusions that plaintiffs have failed to demonstrate the existence of racial polarization or white bloc voting in the nomination or election of the Supreme Court Justices, the Court finds that plaintiffs are unable to overcome the defendants' substantial interest in maintaining the State's current system of choosing its judiciary.

### CONCLUSION

The plaintiffs have failed to prove by a preponderance of the evidence the existence of the first or third *Gingles* preconditions. They similarly failed to prove that "the totality of circumstances" point to a system that provides African–American and Latino voters in New York City with less of an opportunity to participate in the election of Supreme Court Justices. For all these reasons, judgment shall be entered in favor of the defendants dismissing the complaint in this action with prejudice. The Clerk of the Court shall enter an appropriate judgment and close the above-captioned action.

It is **SO ORDERED.**