Loren J. **MONTANO, Philip Ramos, Leonard D. Fillyaw, Jordan K. Wilson, Jr. and Luis Oliveria on behalf of themselves and all other similarly situated persons, Plaintiffs,**

v.

**SUFFOLK COUNTY LEGISLATURE, County of Suffolk, Suffolk County Board of Elections, Robert Gaffney in his official capacity as County Executive of the County of Suffolk, Defendants.**

No. 03–CV–1506(ADS)(ARL).

United States District Court, E.D. New York.

June 21, 2003.

Frederick K. Brewington, Hempstead, NY, for Plaintiffs.

McLaughlin, Gouldborne & Cohen, P.C. by Randolph M. McLaughlin, Of Counsel, Bronx, NY, for Plaintiffs.

Ferruggia & Calisto, LLP by Edward A. Calisto, Of Counsel, Hauppauge, NY, for Plaintiffs.

Bee, Ready, Fishbein, Hatter & Donovan, LLP by Peter A. Bee, Of Counsel, Mineola, NY, for Defendants.

Robert J. Cimino, Suffolk County Attorney, by Robert Cabble, Deputy County Attorney Hauppauge, NY.

William D. Wexler, North Babylon, NY, for Intervenors Maxine Postal, David Bishop, Jon Cooper, Ginny Fields, William Lindsay, Brian Foley, Vivian Viloria Fisher and George Guldi.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

In this case, the plaintiffs, Hispanic and African–American voters in Suffolk County, allege that the present redistricting plan for the Suffolk County Legislature (the "Legislature"), namely Resolution No. 402–2003 ("Resolution 402") violates the Voting Rights Act of 1965, 42 U.S.C. § 1973, and the Fourteenth and Fifteenth Amendments to the United States Constitution. The plaintiffs allege that the violations involve two of the eighteen legislative districts, namely proposed districts 9 and 15.

Presently before the Court is a motion for a preliminary injunction declaring Resolution 402 in violation of the Voting Rights Act and the Constitution; enjoining legislative elections under Resolution 402; appointing a Special Master to assist the Court in redrawing the legislative district lines; and directing Suffolk County to pay for the costs of a Special Master. In response to this motion, the Court has conducted an evidentiary hearing at which nine witnesses testified over a period of four days.

Because of the urgency of this matter in view of the time constraints of the mandated primary election dates for the circulation and filing of designating petitions, the Court held the evidentiary hearing on Friday May 30, Saturday May 31, Monday June 2 and Tuesday June 3, 2003. This decision contains the Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil

Procedure. In *Rosen v. Siegel*, 106 F.3d 28 (2d Cir.1997), the rule with regard to decisions determining preliminary injunctions was set forth as follows:

> [T]he district court in granting or refusing interlocutory injunctions shall ... set forth the findings of fact and conclusions of law which constitute the grounds of its action.... This requirement is essential to effective appellate review: absent explicit findings, we lack a clear understanding of the grounds or basis of the decision of the trial court.... It further encourages the trial judge to ascertain the facts with due care and to render a decision in accord with the evidence and the law.

*Id.* at 32 (internal quotation marks and citations omitted).

## I. THE PARTIES

The plaintiffs are Loren J. Montano ("Montano"), Philip Ramos ("Ramos"), Leonard D. Fillyaw ("Fillyaw"), Jordan K. Wilson, Jr. ("Wilson") and Luis Oliveria ("Oliveria"). Montano is an Hispanic resident and a registered voter in Central Islip, New York. Ramos is an Hispanic resident and a registered voter in Brentwood, New York. Fillyaw is an African–American resident and a registered voter in Central Islip, New York. Wilson is an African–American resident and a registered voter in North Babylon, New York. Olivera is an Hispanic resident and a registered voter in North Bay Shore, New York.

The defendants are the Suffolk County Legislature (the "Legislature"), the County of Suffolk, the Suffolk County Board of Elections, Robert Gaffney ("Gaffney") and the New York State Board of Elections. The County of Suffolk is a municipal corporation existing under the laws of the State of New York. The Legislature is a body of publically elected officials in Suffolk County. Among other duties, the Legislature has the obligation to redraw the legislative districts in Suffolk County. Gaffney is the Suffolk County Executive and has the authority to consider, sign or take other action concerning laws adopted by the Legislature. The New York State Board of Elections is responsible for creating annual calendars for the political year and administering the Election Law of New York State and the elections held under this law.

## II. THE BACKGROUND

On March 28, 2003, the plaintiffs filed a complaint against the Legislature, its presiding officer Maxine Postal ("Postal"), the County of Suffolk and the Suffolk County Board of Elections (collectively, the "defendants") seeking declaratory and injunctive relief based on their failure to reapportion the legislative districts following the publication of the United States Census for 2000 in violation of the Voting Rights Act of 1965, 42 U.S.C. § 1973.

On May 7, 2003, the plaintiffs filed an amended complaint adding causes of action under the Fourteenth and Fifteenth Amendments to the United States Constitution. On that same day, the plaintiffs moved by order to show cause for a temporary restraining order directing the defendants to cease all business in Suffolk County until they adopt a legislative redistricting plan, or in the alternative, for an order appointing a Special Master to recommend a redistricting plan.

On May 14, 2003, the Court heard oral argument on the plaintiffs' motion. At that time, the parties informed the Court of the following deadlines in the political calendar: June 3, 2003 is the first day for candidates to circulate designating petitions for the legislative primary election; July 10, 2003 is the last day for candidates to file designating petitions; the primary

election is scheduled for September 9, 2003; and the general election will be held on November 4, 2003. The Legislature was required to reapportion all the legislative districts in Suffolk County within 6 months of the publication of the results of the regular 2000 Federal Census. Despite the years of discussion, committee meetings and public hearings, and notwithstanding that June 3, 2003 was the first day for circulating designating petitions for legislators, the Legislature failed to act to reapportion the legislative districts.

After hearing argument on May 14, 2003, the Court ruled in an oral decision that the defendants had failed to timely reapportion the existing district lines of the Legislature in compliance with the Voting Rights Act. That day, the Court issued a written order directing the Legislature to hold a meeting the next day May 15, 2003 to consider and adopt a redistricting plan and that in the event a plan was not adopted, the Court would appoint a Special Master to assist it in preparing a redistricting plan. That same day, both parties returned with an amended written order which provided for the suspension of the Legislature's normal rules for the May 15, 2003 meeting. At the request of both parties, the Court issued the amended order.

On May 16, 2003, the parties again appeared before the Court. At that time, the defendants reported that on the previous day, May 15, 2003, the Legislature had complied with the Court's order and had adopted a redistricting plan, namely Resolution 402. All 18 legislators were present for that meeting. 10 legislators voted in favor of Resolution 402; 7 legislators voted against the resolution and 1 abstained. However, the defendants informed the Court that, before Resolution 402 can be formally enacted into law, the County Executive must approve it after a public hear-

ing; 45 days must pass to allow for a possible public petition; and the resolution must be filed with the New York State Secretary of State.

At the May 16, 2003 session, the plaintiffs made an oral application to enjoin the Legislature from taking action to enact Resolution 402 asserting that it violated the Voting Rights Act and the Constitution. The Court stated that the plaintiffs must bring their motion for a preliminary injunction by order to show cause. At that time, the counsel for the 7 legislators who had voted against Resolution 402 and the 1 legislator who had abstained, namely Postal, David Bishop ("Bishop"), Jon Cooper ("Cooper"), Ginny Fields ("Fields"), William Lindsay ("Lindsay"), Brian Foley ("Foley"), Vivian Viloria–Fisher ("Fisher") and George Guldi ("Guldi") (collectively, the "Intervenors") appeared in Court and also argued that Resolution 402 violated the Voting Rights Act. The Court informed the legislators that they must proceed with a formal motion for leave to intervene, upon proper notice to all parties.

On May 19, 2003, the plaintiffs moved by order to show cause for an order: (1) granting them leave to file a second amended complaint challenging Resolution 402, adding the County Executive as a defendant and removing Postal as a defendant; (2) declaring that Resolution 402 violates Section 2 of the Voting Rights Act; (3) declaring that Resolution 402 violates the Fourteenth and Fifteenth Amendments to the United States Constitution; (4) preliminarily and permanently enjoining the defendants from calling, holding, supervising or certifying any further elections under the existing or proposed Legislative district lines for any term of office commencing January 1, 2004; (5) preliminarily and permanently enjoining the County Executive Robert Gaffney or any of his designees from executing and/or

adopting Resolution 402; (6) appointing a Special Master to assist the Court in drawing district lines for the Legislature that comply with the United States Constitution and the Voting Rights Act; (7) directing the defendants to make all of their computer resources, statistical data and personnel with expertise in reapportionment available to the Court until the Court is satisfied that a valid and proper redistricting plan is in place; and (8) directing the County of Suffolk to pay for the costs associated with the appointment and work of the Special Master. On that same day, the Intervenors moved by order to show cause for leave to intervene in the action pursuant to Rule 24(b) of the Federal Rules of Civil Procedure and to pursue the same relief sought by the plaintiffs in the second amended complaint.

At a May 22, 2003 court session, the Court granted the intervenors' motion to intervene as plaintiffs; granted the plaintiffs' motion for leave to file a second amended complaint; and added the New York State Board of Elections as a defendant in the action. The Court also directed the parties to submit, on or before May 23, 2003 at 5 p.m., their arguments concerning three issues: (1) whether a challenge to Resolution 402 under federal law and the Constitution is ripe for judicial review; (2) whether the Court should extend the dates for candidates to circulate and file petitions to qualify for the legislative primary election in Suffolk County; and (3) whether the appointment of a Special Master is necessary to assist the Court in its determination concerning the validity of Resolution 402.

In a written decision dated May 27, 2003, the Court determined that a challenge to the validity of Resolution 402 under the Voting Rights Act and the Constitution was ripe for judicial review; that the plaintiffs must first satisfy the requirements for injunctive relief before the dates for candidates to circulate and file petitions for the legislative primary election could be extended; and that a Special Master should not be appointed at this time. *Montano v. Suffolk County Legislature*, 263 F.Supp.2d 644 (E.D.N.Y.2003). In addition, the Court directed the parties to appear for an evidentiary hearing to address the plaintiffs' challenge to Resolution 402 under the Voting Rights Act and the Constitution. *Id.* at 650.

On May 30, 2003, the plaintiffs filed their third amended complaint adding the New York State Board of Elections as a defendant.

## III. THE PLAINTIFFS' EXPERT AFFIDAVITS

In support of their motion for a preliminary injunction, the plaintiffs submitted affidavits from two experts: Dr. Andrew A. Beveridge and Dr. Orville Vernon Burton. Dr. Beveridge is a sociology professor at Queens College, City University of New York. *See* Affidavit of Dr. Andrew A. Beveridge dated May 18, 2003 (the "Beveridge Affidavit") ¶ 1. Dr. Burton is a professor of History and Sociology at the University of Illinois at Urbana–Champaign. *See* Affidavit of Dr. Orville Vernon Burton dated May 19, 2003 (the "Burton Affidavit") ¶ 1.

In his affidavit, Dr. Beveridge stated that he is an expert in demographic and statistical analysis. He was retained by the plaintiffs for the purpose of determining whether Resolution 402 complies with generally accepted redistricting principles and whether it dilutes minority voting strength. To accomplish this task, Dr. Beveridge reviewed various election material including the Election Districts in Suffolk County and data from the United States Census Bureau, that illustrated information on the racial composition and

ethnic status of the total and voting age population for each Census Block in Suffolk County. Based upon his analysis, Dr. Beveridge came to these conclusions:

(a) The plan adopted is fatally flawed, since it does not comply with New York State 'one person, one vote' doctrine. One district is larger than the average district size by over five percent[;] (b) The plan substantially dilutes the voting strength of Latino voters by both packing extra non Latino population into the district that is plurality Latino, and by splitting off from that district and placing in two other districts the areas with the highest concentrations of Latinos[; and] (c) It is apparent that the methods used to conduct redistricting in Suffolk County are sub-par, when compared to those commonly used in this round of redistricting throughout the United States. For these reasons, even upon adoption, we have no exact numbers of population or minority concentration, rather simply estimates done by hand by the "Program Coordinator" for the redistricting committee.

*Id.* ¶ 7(a)-(c).

In support of his conclusion that Resolution 402 does not comply with "one person, one vote", Dr. Beveridge stated that Legislative District 9 ("LD9") contains a population of 84,032 which is 6.6 percent more than the ideal population for each district. The ideal population for each district is 78,854. Based upon this 6.6 percent deviation, Dr. Beveridge concluded that the political power of Hispanics living in LD9 is diluted.

In support of his conclusion that Resolution 402 substantially dilutes the voting strength of the Hispanic population, Dr. Beveridge noted that a redistricting plan proposed by Fisher, one of the intervenors, would have created an LD9 with 52.0 percent Hispanic, while Resolution 402 created an LD9 with 45% Hispanic. Dr. Beveridge concluded that this 7 percent difference between the two plans showed a substantial dilution of the voting strength of the Hispanic population. He also noted that Resolution 402 splits Hispanic residents into three different Legislative Districts, namely Districts 9, 10 and 11. He noted that "[i]t is quite possible and preferable to produce a District 9 that has a much higher concentration of [Hispanic] residents, so that [Hispanic] voting strength is not diluted." *Id.* ¶¶ 15, 16. He then stated that he created a redistricting plan (the "Beveridge Plan") that established an LD9 with a 52.61% total Hispanic population with a deviation of –3.81%.

In support of his conclusion that the Legislature used a "sub-par" redistricting process, Dr. Beveridge stated that the Legislature should have used Voting Tabulation Districts ("VTD's") instead of Census Blocks. He noted that it is difficult to assign population to election districts and that he had a problem confirming the accuracy of the Legislature's statistics as to the various election districts.

In his affidavit, Dr. Orville Vernon Burton stated that he has extensive experience in analyzing social and economic status, discrimination, intent in voting rights cases and group voting behavior. He has also served as an expert witness and consultant in a number of voting rights and redistricting cases. The plaintiffs retained him for the purpose of his opinion with regard to racial polarized voting in Suffolk County. In that regard, Dr. Burton stated that he studied and analyzed all relevant elections to decide whether racially polarized voting existed in Suffolk County elections. Based upon his analysis of these and other elections, Dr. Burton concluded that there is strong racial bloc voting against minority preferred candidates in Suffolk County; that minorities vote as a bloc and are a

cohesive unit; that Hispanics and African-Americans generally vote differently than non-Hispanic whites; and that Hispanics vote coherently when they have the opportunity to elect a candidate of their choice.

## IV. THE EVIDENTIARY HEARING

On May 30, 2003, the Court commenced the evidentiary hearing. Before the hearing, the Court identified the specific relief sought in the plaintiffs' motion for a preliminary injunction, namely: (1) declaring Resolution 402 in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution; (2) enjoining the defendants from holding any legislative elections under Resolution 402; (3) appointing a Special Master to assist the Court in redrawing the legislative district lines; and (4) directing Suffolk County to pay for the costs of a Special Master. Tr. at 9–10.*

### A. The Plaintiffs' Evidence

The plaintiffs introduced testimony from 7 witnesses. The plaintiffs' two principal witnesses were Dr. Beveridge and Dr. Burton.

Dr. Beveridge was qualified as an expert in the field of redistricting and demography. The plaintiffs retained Dr. Beveridge for the purpose of determining whether Resolution 402 followed generally accepted redistricting principles and whether it had a negative effect on African–American and Hispanic voting strength or its dilution.

Dr. Beveridge testified that Resolution 402 dilutes the voting strength of Hispanics in Legislative District 9 ("LD9"). He defined "deviation" as how much the population at issue was above or below the average population. First, he testified that LD9 has a deviation from the ideal population for each district of about 7%. Second, he testified that Resolution 402 splits the Hispanic communities in Brentwood, Central Islip and North Bay Shore into three districts, which diluted the strength of Hispanic voters.

Dr. Beveridge testified further that he created his own redistricting plan from the Suffolk County blocks which included the population from the Census redistricting files (the "Beveridge Plan"). In the LD9 of the Beveridge Plan, the total Hispanic population is 52.61%; the total Non Hispanic African–American population is 18.74% and the total Non Hispanic White population is 23.91%. *See* Exhibit 18(h). The Beveridge Plan purportedly has a Voting Age Population ("VAP") of 50.74% Hispanic.

On cross-examination, Dr. Beveridge testified that there were no material variations between the populations arrived at using the Election Districts ("EDs")(units used by Suffolk County) and the Voting Tabulation Districts (the "VTDs") (units provided by the Census Bureau).

Also, significantly, in the Beveridge Plan, the population figures included all inhabitants of whatever status.

Q. And what would the percentage of Blacks be?

A. African–Blacks would be 18.74 percent.

Q. So that there would be a reduction of the voting strength of Blacks under the plaintiff's proposed plan but an increase in the voting strength of Hispanics?

A. Yes. The population, yes.

Q. Well, perhaps we should look at that for a moment. Are these all population figures?

A. Yeah.

* Tr. refers to the Hearing Transcript.

Q. By that I mean inhabitants of the state for whatever reason and by whatever characterization?

A. Counted by the census, yes.

Q. Both citizen and noncitizen?

A. Yes.

Q. Minor and over 18?

A. This, yeah, minor and over 18.

Q. Convicted felon and otherwise?

A. Et cetera.

Tr. at 147.

Also of importance, the Beveridge Plan does not include the number of Hispanic citizens.

Q. Have you calculated the number of Hispanic citizens in the plaintiff's proposed plan?

A. I've used, I haven't used citizenship numbers in any of my calculations, so the answer is no.

Q. Is that in large measure because the Census Bureau does not provide those statistics?

A. As I testified before, they're on the long form and you can get citizenship data at the level at least at the tract level, they used to be you could get it to the blocker.

Q. How large is a tract level in relationship to Suffolk County?

A. Tracks [sic] are roughly 4,000 people.

Q. And that data is available?

A. Yes.

Q. But you have not accessed that data in performing your analysis for your testimony today?

A. No, I have not.

Q. So sitting here today you do not know the percentage of Hispanic citizens in any of the portions of Suffolk County?

. . . . .

A. No. I don't.

Tr. at 149–50.

Dr. Beveridge believed that the total population of Hispanics in Suffolk County was approximately 10 to 12 percent. He testified that he did not conduct any studies concerning the voting patterns in Suffolk County. He stated further that his opinion concerning the dilution of the voting strength of Hispanics refers to the population in total. He was not concerned with the rights of Hispanic voters who are eligible to vote or registered to vote. Nor was he concerned with voter turnout.

Q. On direct examination I have a note that you testified that splitting the concentrated Hispanic population at the western end of your proposed District 9 into three legislative districts under the enacted plan for District 9 diluted Hispanic voting strength.

A. Yes.

Q. And made it more difficult for them to choose their own candidate?

A. Yes.

Q. But I also recall on cross-examination you testifying that that was not your area of expertise?

A. It's not.

Q. And that you have not performed any analyses, regression analysis or otherwise, to determine whether or not voting strength has been diluted, if we define voting strength to be the right to vote.

A. The right to vote?

. . . . .

Q. Did you not earlier testify that by dilution of voting strength you meant a reference to population in total?

A. Yes, population, a large fraction of who will vote.

Q. But you were not using the smaller unit of those who are eligible to vote.

A. No. I'm not presenting data on those who are eligible to vote, nor on registered voters, nor on voting turnout.

Tr. at 162–63.

Dr. Orville Vernon Burton is a sociologist who is an expert in the area of Voting Rights cases and racial bloc voting. The plaintiffs retained Dr. Burton in May 2003 and instructed him to determine whether racial bloc voting existed in Suffolk County and whether Hispanics voted cohesively as a unit in Suffolk County. Dr. Burton testified that in April 2002 he received VTD data from the New York State Legislative Task Force Redistricting ("LATFOR") and analyzed all the New York State Senate elections between 1996 and 2000. As part of this analysis, Dr. Burton used a number of methods to evaluate the VAP of whites, African–Americans and Hispanics in those elections. The methods included: Homogeneous Precinct Analysis or Extreme Case Analysis; Multivariate Ecological Regression Analysis; Bivariate Regression Analysis; and Ecological Inference Analysis.

To determine whether racial bloc voting occurred in Suffolk County, Dr. Burton relied on the results of the methods used in his previous analyses of the data received from LATFOR for Districts 3, 4 and 8 of the New York State Senatorial Elections. Dr. Burton chose these districts because he believed that they comprise Suffolk County in its entirety. This assumption was incorrect because Suffolk County is comprised of whole or parts of State Senate Districts 1, 2, 3, 4, 5 and 8. Based upon his analysis of each method, Dr. Burton was of the opinion that white racial bloc voting existed in the New York State Senatorial races for Districts 3, 4 and 8 between 1996 and 2000. In support of this conclusion, each method showed that whites in these districts voted over-whelmingly in favor of white preferred candidates and against the Hispanic, African–American and/or minority preferred candidates who were defeated.

Dr. Burton opined further that Hispanics and African–Americans voted in a very high political cohesion in the New York State Senatorial races for Districts 3, 4 and 8 between 1996 and 2000. In support of this conclusion, each method showed Hispanics and African–Americans voted for their preferred candidate in significantly high percentages. Based upon the data from the New York State Senatorial races in Districts 3, 4 and 8, Dr. Burton testified that in Suffolk County there is strong white racial bloc voting; strong Hispanic political cohesion; and strong African–American political cohesion.

On cross-examination, Dr. Burton conceded that he was unable to render an opinion based upon a reasonable degree of certitude that there is racial bloc voting in legislative elections in Suffolk County because he has not reviewed the data for those elections.

Q. Does your data suggest that it is the existence of a majority of white voters voting as a block which prevents minority preferred candidates; that is, candidates preferred by blacks and Hispanics, from being elected?

A. From these elections, yes, in each case for blacks and for Hispanics.

Q. Do you extrapolate from that that there is racial block voting taking place in Suffolk County?

A. Yes.

Q. And do you extrapolate from that that it is taking place at a variety of electoral levels?

A. Can you define electoral levels?

Q. For example, do you have an opinion on whether racial block voting is

taking place in assembly elections in Suffolk County?

A. I do not—I have not had opportunity or the data to look at assembly elections. So this is as close I can get. I really can't testify to the assembly election.

Q. Doctor, this, as I argued to the court before, is a somewhat technical area, so we need your help. And I guess the question we need to ask is are you able, with a reasonable degree of professional certainty, to use that data that you have collected and extrapolate from that and draw conclusions about whether or not minority preferred candidates are or would be defeated in elections other than senatorial elections in Suffolk County?

A. Just from these tables?

Q. From any of the information that you have utilized in order to form the opinions you have reached and expressed today in your testimony.

A. I have found racial block voting in Suffolk County. I cannot say that I have found racial block voting in the legislative district. But because I found racial block voting in these elections and others then I would assume, but I have not studied those—I didn't have the data, that racial block voting would also occur there. But I cannot testify to those elections.

. . . . .

Q. I'm sorry. My question was can you tell the court with a reasonable degree of professional certainty that there is racial block voting in assembly district elections in Suffolk County?

A. I'll have to change my previous answer. The way it's worded, I cannot, with certainty, say that there is racial block voting in assembly election—legislative elections.

. . . . .

Q. Given enough time and data, I take it you could form a professional opinion with a reasonable degree of professional certitude about assembly district elections in Suffolk County?

A. Yes.

Q. But you cannot do so today?

A. No, not with the certitude that I have for racial block voting in the county, because I have not studied elections.

Q. And the degree of certitude I'm asking for is a reasonable degree of professional certitude. With that degree, can you form an opinion about racial block voting in assembly district elections in Suffolk County today?

A. No.

Q. Can you do so for town elections in Suffolk County today?

A. For the town—

Q. For any town within the County of Suffolk for town elections, the election of town leaders in Suffolk County today?

A. No.

Q. Can you do it for village elections in Suffolk County today?

A. No.

Q. Can you do it for legislative district in the County of Suffolk today?

A. No.

Tr. at 465–67; 470–71.

Dr. Burton further conceded that voting age population is not the same as voting age citizens.

Q. Now, let me first clarify that term. Is voting age population the same thing as registered voters?

A. No.

Q. Is voting age population the same thing as eligible to register voters?

A. No.

Q. Is voting age population the same thing as voting age citizen?

A. No.

Q. So voting age population includes a larger number than voting age citizens?

A. You would assume so. You know, theoretically it would be otherwise, but yes, you would assume that.

. . . . .

Q. Can you say with a reasonable degree of professional certitude, that in Suffolk County the voting age population in each and every VTD will be larger than the voting age citizen?

A. No.

Q. So there could be VTDs in which every inhabitant of voting age is also a citizen?

A. Yes.

Q. Could there also be many VTDs where the, many of the inhabitants of voting age are not citizens?

A. Yes.

. . . . .

Q. So do you have any data to tell you the difference in size between the voting age population in the VTDs in column one of Exhibit 28 and the voting age citizens population?

A. I do not have it.

Tr. at 488–89.

Later in Dr. Burton's testimony, the same subject was raised.

Q. Did you not testify earlier that you were unable to say with a reasonable degree of professional certainty that racial block voting exists in legislative district races here, today, in Suffolk County?

A. Yes.

Tr. at 539.

In fact, Dr. Burton has never even reviewed the reapportionment plan for Legislative District 9 in this case.

Q. Are you aware that Suffolk County has enacted a proposed, has enacted a reapportionment plan and that that plan is the subject of this litigation?

A. I read the judge's order, I assume I'm aware of it because I read it.

Q. Are you further aware that one of the districts enacted, District 9, has a 65 percent combined black and Hispanic population?

A. No. I was not aware of any number of anything. I don't know the plan at all. I've heard people talk, but I have not looked at the plan or know what percentage of it, a portion of it.

Tr. 497–98.

The plaintiffs presented additional witnesses: Raquel Batista; Elba Galvan, Esq.; Ricardo Montano, Esq.; Jordan K. Wilson, Jr. and Legislator Vivian Viloria–Fisher.

Raquel Batista is employed by the Puerto Rican Legal Defense & Education Fund ("PRLDEF"). She formed the Latino Voting Rights Committee. On behalf of the committee, Batista wrote to the members of the Reapportionment Committee seeking a plan that would reflect the interests of the Hispanic Community. Batista received no response from her letters. Elba Galvan, Esq. is Special Counsel to PRLDEF. She testified before the Suffolk County Legislature and sent letters to the legislators on the redistricting issue concerning the Hispanic communities concerns for reapportionment.

Ricardo Montano is an Assistant Attorney General in the State of New York who is presently on unpaid status. He is a resident of Central Islip. Montano was

formerly Executive Director of the Suffolk County Human Rights Division. Montano testified that Central Islip, Brentwood and North Bay Shore have large Hispanic populations with black and some white populations. They are predominately Hispanic communities. He stated that Resolution 402 divides the Hispanic community along Fifth Avenue. He further testified that he believed the Hispanic community was more than half of the total population, but did not know the percentage of voting age citizens.

Jordan Wilson is a resident of Legislative District 15 ("LD15"). He testified that the new LD15 (adopted in Resolution 402) added the incorporated Village of Amityville in its entirety (a predominately white community) and deleted certain Election Districts (mixed white and Hispanic communities). He further stated that under the previously existing LD15, the total black population was 39% and that the total population of former LD15 was 73,-885; approximately 5000 persons below the ideal population and 93.7 percent of the ideal population figure. Under the new LD15, the total black population is 34 percent and the total population is 77,225 which is 98% of the ideal population figure. On cross-examination, Wilson conceded that he is not aware of any black communities which surround LD15 that could have been added to increase the population of that district. He further conceded that a certain number of predominately white election districts were removed from the former legislative district.

Q. Is the population of the preexisting 15th legislative district therefore approximately 5,000 persons below the so-called ideal or target population in a post 2000 census?

A. 4,000 and change.

Q. 4,969?

A. Can't argue, yes.

Q. Is that not 93.9 percent of the so-called target figure?

A. I'm not aware. I don't have a calculator. I can't tell you.

Q. Now, you testified that a certain number of election districts were taken out of the 15th LD between the old LD and the new LD; is that correct?

A. Yes, I did.

Q. And that's designated by an area of yellow to the east of the salmon-colored area?

A. Yes.

Q. Do you know whether or not the population of those particular EDs was predominately white or predominately black?

A. As far as I know, they're predominately white.

Q. So a number of white election districts were removed from the old LD in that particular area?

A. It appears that way.

Tr. at 583.

In addition, Wilson testified that if one wanted to add population in Legislative District 15 to reach the ideal population, there is no African–American population nearby, except perhaps on the northern border.

Q. Now, if one wanted to add population to the 15th LD as it existed before the most recent enactment in May of 2003, if one felt that the population of the old 15th LD was too light, too low, and we needed to add population figures to that, could you tell me from what area surrounding the old 15th LD one could have added a predominately black or African–American population?

A. Not aware of any.

Tr. at 590–91.

Vivian Viloria–Fisher is a member of the Democratic Party and is currently the Suffolk County Legislator for Legislative District 5. She developed two legislative redistricting plans. The first plan did not have any support from the Republican legislators because it created a district with two Republican incumbents. The second plan (the "Fisher Plan") created what she believed was a majority-minority district for Hispanics in LD9. Fisher defined a majority-minority district to mean more than 50 percent of the total Hispanic population in the district. The Fisher Plan had a total Hispanic population of 52% for LD9. Fisher testified that her plan did not consider the total VAP of Hispanics or the citizenship of Hispanics.

Legislator Fisher also testified that Hispanics constituted 10% of the total Suffolk County population. As the only Hispanic legislator, she was one out of 18 and represented approximately 6% of the total legislators. In discussions with Legislator Andrew Crecca, she advised him that she believed a majority-minority district in the Ninth Legislative District should consist of more than 50% of the Hispanic population. Legislator Crecca believed that a majority-minority district was one where the combined Hispanic and African–American population was more than 50%. In Resolution 402, Legislative District 9 does achieve that result in that the percentages are 45% Hispanic and 20% African–American. Interestingly, Elie Mystal, who is the aid to the Democratic Presiding Officer Maxine Postal, disagreed with Fisher's position, as to the definition of a majority-minority district.

### B. The Defendants' Evidence

The defendants introduced testimony from 2 witnesses: Dr. Peter Morrison; and Legislator Andrew A. Crecca. Dr. Morrison is an expert in demography. The defendants retained him during the week of May 26, 2003 to identify the total population; the total voting age population; and the voting age citizens in Suffolk County. Dr. Morrison's analysis was based on the plaintiffs' second amended complaint, the most recent order to show cause and 2000 Census Data that provides the citizenship and age with respect to Hispanics, African–Americans and Others.

Dr. Morrison testified that in Suffolk County the number of inhabitants is 1,419,-369 and the number of voting-age citizens is 978,073. Based upon these figures, the percentage of voting-age citizens in Suffolk County is 68.9% of the population. *See* Ex. G. Dr. Morrison stated that Hispanics in Suffolk County make up 101,251 of the total voting-age population and 65,379 of the citizen voting-age population. Based upon these figures, the total percentage of Hispanic citizens in Suffolk County is 64.6%. Dr. Morrison further testified that the percentage of voting-age citizens in Brentwood Census Designated Place ("CDP") is 52%; Central Islip CDP is 63.9% and North Bay Shore CDP is 57.4%. Dr. Morrison further testified that the percentage of Hispanic voting-age citizens in the Beveridge Plan is 40%. Dr. Morrison also noted that the percentage of Hispanic voting age citizens in Suffolk County is 6.67%. This is very interesting, because there is only one Hispanic legislator in the Suffolk County Legislature, which comprises 6% of the total legislators. So that the percentage of Hispanic voting age citizens (6.6%) is roughly similar to the percentage of Hispanic legislators. On cross-examination, the plaintiffs did not challenge the accuracy of Dr. Morrison's figures or his conclusions.

Andrew A. Crecca is a Republican Suffolk County Legislator who represents

Legislative District 12. He testified concerning the steps that he took to develop Resolution 402. First, he reviewed the old Legislative Districts to determine where adjustments were needed to achieve the ideal population figure. Second, he reviewed the geography of the old Legislative Districts. Third, he spoke with Republican and Democratic legislators in Suffolk County about their concerns with regard to a new redistricting plan.

In developing Resolution 402, Crecca testified that he considered many factors. Those factors included maintaining previous Legislative District lines; maintaining political subdivisions (*i.e.* town lines), boundary lines and Census Designating Places ("CDPs"). In addition, he also considered issues of race; ethnicity; the ideal population figure; compactness; contiguity and incumbency. Further, he gave specific examples where Resolution 402 took these factors into account. In this regard, he showed how town lines were maintained; CDP's were kept together, or reunited; and race and the ideal population were considered. The total population of Suffolk County is 1,419,369. The average population of the 18 legislative districts is 78,854. One of the goals was to achieve as close to equal population districts as possible.

In developing LD9, Crecca consider the above noted factors. Crecca testified further that he recognized that there is a growing population of Hispanics in the Brentwood CDP, the Central Islip CDP and the North Bay Shore CDP and that these CDPs contain over 100,000 people. Considering the ideal population figure is 78,854, Crecca stated that it was necessary to split these communities from each other. He also testified that one of his goals was to keep Central Islip intact. To accomplish this goal, Resolution 402 excised two and one half EDs in Brentwood.

Crecca testified that this was the best option because it kept Central Islip intact and retained about 95% of Brentwood. Crecca also testified that if the entire Brentwood community was added to LD9, it would have increased the percentage beyond the ideal population by about 15%; that he did not want to divide Central Islip down the middle; and that the Brentwood community could not be added to adjoining Legislative District 11 because it would have too greatly increased that district's population. Finally, Crecca testified that he added the Village of Amityville to LD15 because the district was below the ideal population by about 5,000 inhabitants and there were no significantly African–American communities surrounding this district.

## V. THE ADOPTED PLAN

The population of the legislative districts set forth in Resolution 402 is as follows:

| New LD | Total | Deviation from Ideal Population |
|--------|-------|-------------------|
| LD1 | 81,152 | 103% |
| LD2 | 76,106 | 97% |
| LD3 | 81,344 | 103% |
| LD4 | 80,982 | 103% |
| LD5 | 78,643 | 100% |
| LD6 | 77,085 | 98% |
| LD7 | 78,642 | 100% |
| LD8 | 75,948 | 96% |
| LD9 | 84,032 | 107% |
| LD10 | 80,198 | 102% |
| LD11 | 76,260 | 97% |
| LD12 | 76,003 | 96% |
| LD13 | 77,245 | 98% |
| LD14 | 81,605 | 103% |
| LD15 | 77,225 | 98% |
| LD16 | 76,959 | 98% |
| LD17 | 79,751 | 101% |
| LD18 | 80,189 | 102% |

As presently constituted, LD9 is made up of 45% Hispanic; 20% African–American and 35% Others. LD15 is made up of 15% Hispanic; 34% African–American and 51% Others.

## VI. ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. INJUNCTIVE RELIEF

[1] A preliminary injunction is generally granted when the party seeking the injunction shows that (1) absent injunctive relief, she will suffer irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) that there are sufficiently serious questions going to the merits of the claims which make them a fair ground for litigation, and a balance of hardships tips decidedly in the movant's favor. *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir.2000); *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). On the other hand, where, as here, "the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction will be granted only if the moving party meets the more rigorous likelihood-of-success standard." *No Spray Coalition, Inc. v. City of N.Y.*, 252 F.3d 148, 150 (2d Cir.2001) (*per curiam*) (internal quotation marks omitted); *see, e.g., Rockefeller v. Powers*, 74 F.3d 1367, 1376–77 (2d Cir. 1995) (applying the more rigorous standard of preliminary relief in the context of candidate ballot access in a primary election). When such an injunction against the government "will alter rather than maintain the status quo, the movant must show ... [a] substantial likelihood of success." *No Spray Coalition*, 252 F.3d at 150 (internal quotation marks omitted).

■ Because an injunction in this case will alter the status quo, namely declaring Resolution 402 invalid will force the Legislature to enact a new redistricting plan, it appears that the plaintiffs would have to establish a substantial likelihood of success on the merits. *See Queens County Republican Comm. ex rel. Maltese v. New York State Bd. of Elections*, 222 F.Supp.2d 341, 346 (E.D.N.Y.2002). However, there is authority to suggest that the plaintiffs must only establish a likelihood of success on the merits. *See Rockefeller*, 74 F.3d at 1376–77 (requiring the plaintiffs to show a likelihood of success on the merits in a ballot access case). Here, the Court will require the plaintiffs to show a likelihood of success on the merits.

■ Even if the plaintiffs are able to show irreparable harm and a likelihood of success on the merits, the Court must then consider whether it is against the public interest to grant injunctive relief faced with an impending election. *See Diaz v. Silver*, 932 F.Supp. 462, 468–69 (E.D.N.Y. 1996) (denying motion for a preliminary injunction seeking to prevent elections under challenged congressional redistricting plan); *Cardona v. Oakland Unified School Distr., Cal.*, 785 F.Supp. 837, 842 (N.D.Cal. 1992) ("The strong public interest in having elections go forward, for example, weighs heavily against an injunction that would delay an upcoming election."); *Govern v. Connolly*, 637 F.Supp. 111, 115 (D.Mass.1986) (same). *See also Hirschfeld v. Bd. of Elecs. in the City of New York*, 984 F.2d 35, 39 (2d Cir.1993) (recognizing that under certain circumstances involving election cases, a court should not entertain a willfully delayed eleventh hour motion for preliminary injunctive relief). However, courts have generally not precluded injunctive relief unless the delay in moving for injunctive relief occurs on the eve of the primary or general elections. *Puerto Rican Legal Def. & Educ. Fund. Inc. v. City of New York*, 769 F.Supp. 74, 79 (E.D.N.Y.1991).

### 1. Irreparable Harm

■ An abridgement or dilution of the right to vote constitutes irreparable harm.

*See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964) (stating that the right to vote is a fundamental political right); *Puerto Rican Legal Def. & Educ. Fund,* 769 F.Supp. at 79 (same). Here, the plaintiffs have shown that Resolution 402 divides members of the Hispanic community in Brentwood, Central Islip and North Bay Shore into three Legislative Districts, namely Legislative Districts 9, 10 and 11, thereby allegedly diluting the strength of their votes. Accordingly, the plaintiffs have established irreparable harm.

### 2. Likelihood of Success on the Merits

The third amended complaint asserts three causes of action: (1) Resolution 402 fails to provide for a majority Hispanic district and fails to provide the full benefits of the law to Hispanic and African-American communities in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973; (2) the legislative districts are unequal in population and based predominately on race in violation of the Fourteenth Amendment to the United States Constitution; and (3) Resolution 402 discriminates against the plaintiffs in violation of the Fifteenth Amendment to the United States Constitution. In order to grant injunctive relief, the plaintiffs must show a likelihood of success on the merits of at least one of these claims.

### a. Section 2 of the Voting Rights Act of 1965

■ Section 2 prohibits the adoption of any election practice, including the drawing of district lines, that "results in a deni-

al or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). This section bars the enactment of election districts which minimize or cancel out the voting strength of minorities thereby depriving the minority group of electing a representative of their choice. *Allen v. State Bd. of Elections,* 393 U.S. 544, 555–56, 89 S.Ct. 817, 826–27, 22 L.Ed.2d 1 (1969). In proving a violation under Section 2, there is no requirement of discriminatory intent, *see Chisom v. Roemer,* 501 U.S. 380, 394, 111 S.Ct. 2354, 2363, 115 L.Ed.2d 348 (1991), while there is such a requirement for the plaintiffs' constitutional claims, *see Gold v. Feinberg,* 101 F.3d 796, 800 (2d Cir.1996).

■ Section 2 does not provide clear guidance as to how to decide whether a voting practice results in the denial of a minority group's ability to elect its representative of choice. Rather, the statute simply directs courts to examine the totality of the circumstances. However, the Supreme Court has enunciated a structure for a Section 2 inquiry in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In a Section 2 vote dilution claim, the plaintiffs must satisfy three "preconditions": "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. at 2766. The reason for this requirement is that until the minority group shows that the legislature can effectively create a majority-minority district, a vote dilution claim is not cognizable because there is no minority voting power to dilute. Second, the minority group must "show that it is politically cohesive." *Id.* at 51, 106 S.Ct. at 2766. The reason for this requirement is that it is only when members of a minority group have shared political views, "it

cannot be said that the selection of a multi-member electoral structure thwarts distinctive minority group interests." *Id.* "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate." *Id.* In this regard, when minority-preferred candidates actually win elections, then the minority is sufficiently able to elect representatives of its choice.

After the three *Gingles* preconditions are satisfied, a court must then assess the totality of the circumstances to decide whether the "effects" test is met—that is, whether minority voters' political power is actually diluted. *Johnson v. De Grandy,* 512 U.S. 997, 1013, 114 S.Ct. 2647, 2658, 129 L.Ed.2d 775 (1994). In a Section 2 inquiry, the Supreme Court has stated that the factors set forth in the Senate Judiciary Committee Report concerning the 1982 Amendment to Section 2 are relevant. *Id.* at 1010, 114 S.Ct. at 2656. Those factors are:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction;

[8] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

[9] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S. REP. No. 97–417, at 28–29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206–07.

### i. The *Gingles* Precondition One— Majority–Minority District

Under the first precondition, the plaintiffs must show that the minority group at issue is sufficiently large and geographically compact to actually be a majority in a hypothetical single-member district. *See Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766. To meet this prerequisite, the plaintiffs must show that a remedy could be fashioned which would enhance the ability of the minority group to elect its preferred candidates. *See id.* at 50 n. 17, 106 S.Ct. at 2766 n. 17.

In support of the first precondition, the plaintiffs introduced the testimony of Dr. Beveridge who presented a plan that would purportedly create a majority-Hispanic district in LD9. In LD9 under the

Beveridge Plan, there is a total population of 52.61% (Hispanic); 18.74% (Non Hispanic African–American) and 23.91% (Non Hispanic White). *Id.* at 112 and Exhibit H annexed to Exhibit 18. The Beveridge Plan purportedly has an Hispanic VAP of 50.74%. The plaintiffs also presented the testimony of Legislator Viloria–Fisher who proposed a redistricting plan that would have created a total Hispanic population for LD9 of 52%.

■ The fatal flaw in the Beveridge Plan and the Fisher Plan is that they fail to consider the citizenship of Hispanics. The express language and the plain meaning of the Voting Rights Act demonstrates that Congress enacted the law to protect citizens against improper voting practices. *See* 42 U.S.C. § 1973(a) ("No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any *citizen* of the United States to vote on account of race or color.") (emphasis added). As such, the proper measure of population in a Voting Rights case is not the total population or total voting age population but rather it is the total citizens eligible to register and vote. *See France v. Pataki*, 71 F.Supp.2d 317, 326 (S.D.N.Y. 1999) (stating that, in a Voting Rights case, "the proper measure of population is the total citizens eligible to register and vote, not the total population."). *See also Valdespino v. Alamo Heights Indep. School Dist.*, 168 F.3d 848, 853 (5th Cir. 1999); *Negron v. City of Miami Beach, Florida*, 113 F.3d 1563, 1569 (11th Cir. 1997); *League of United Latin American Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 743 (5th Cir.1993); *Dickinson v. Indiana State Election Bd.*, 933 F.2d 497, 503 (7th Cir.1991) (requiring "a simple majority of eligible voters in the single-member district."); *Romero v. City of Pomona*, 883 F.2d 1418, 1426 (9th Cir. 1989) ("[E]ligible minority voter population, rather than total minority population, is the appropriate measure of geographical compactness."), *abrogated on other grounds, Townsend v. Holman Consulting Corp.*, 914 F.2d 1136, 1141 (9th Cir.1990) (*en banc* ). Because neither the Beveridge Plan nor the Fisher Plan consider Hispanic citizens, the plaintiffs have not shown that Hispanics could constitute a majority of eligible voters in LD9.

Moreover, even if the plaintiffs were permitted to use the Hispanic VAP for LD9 to meet their burden on this precondition, the Court finds that they have not shown a majority of an Hispanic VAP for this new district. Dr. Beveridge testified that he believed the Hispanic VAP was 50.74% under his plan. However, he submitted no documentation to support this finding. In addition, the Court finds that, with reasonable certainty, that the 50.74% figure is highly unlikely considering that the total Hispanic population for LD9 under his plan was 52.61%. Legislator Viloria–Fisher testified that she did not even consider the Hispanic VAP in her plan. Further, the defendants' expert, Dr. Morrison, testified that the percentage of Hispanic voting-age citizens in the Beveridge Plan is 40% and that there is a high rate of non-citizens in the Hispanic communities of Brentwood, North Bay Shore and Central Islip. This evidence was unrefuted.

Accordingly, the Court finds that the plaintiffs have not satisfied their burden with respect to the first *Gingles* precondition. It therefore follows that the plaintiffs have not shown a likelihood of success on the merits concerning their claim under Section 2 of the Voting Rights Act with regard to the proposed LD9. However, to complete the record, the Court will ad-

dress the remaining preconditions under the Voting Rights Act.

### ii. The *Gingles* Precondition Two— Political Cohesiveness

■ Under the second precondition, the plaintiffs must show that the minority group at issue is politically cohesive. *See Gingles,* 478 U.S. at 51, 106 S.Ct. at 2766. The plaintiffs' expert Dr. Burton testified that Hispanics are a highly politically cohesive group in Suffolk County. He based this opinion on exhaustive research conducted regarding the New York State Senatorial races for Districts 3, 4 and 8 between 1996 and 2000. This research demonstrated that Hispanics voted for their preferred candidate in significantly high percentages. Although Dr. Burton did not testify concerning Hispanic voters political cohesiveness in Suffolk County Legislative elections, his testimony sufficiently establishes, for purposes of this motion, that Hispanics are politically cohesive.

### iii. The *Gingles* Precondition Three—Majority Bloc Voting

Under the third precondition, the plaintiffs must show that white-bloc voting generally defeats the minority-preferred candidate. *See Gingles,* 478 U.S. at 51, 106 S.Ct. at 2766–67. Courts should focus on the presence of white-bloc voting with respect to the elections at issue in the case. *See N.A.A.C.P., Inc. v. City of Niagara Falls, New York,* 65 F.3d 1002, 1015 n. 16 (2d Cir.1995) ("The parties, as well as the district court, focus on City Council elections. This approach makes sense, since it is the City Council elections that are being challenged."); *Pataki,* 71 F.Supp.2d at 327 (noting that expert's report suffers from one of two fatal flaws where it "relies almost exclusively on exogenous elections results, a process that is not appropriate in the instant case.").

■ Here, Dr. Burton testified that there is strong white racial bloc voting in Suffolk County. He based this opinion on research concerning the New York State Senatorial races for Districts 3, 4 and 8 between 1996 and 2000. This research showed that white voters in these districts voted overwhelmingly in favor of white preferred candidates and against the Hispanic, African–American and/or minority preferred candidates who were defeated. However, Dr. Burton's reliance exclusively on exogenous elections (three New York State Senatorial Elections) to conclude that white-bloc voting took place in Suffolk County Legislative elections is insufficient. *See City of Niagara Falls,* 65 F.3d 1002, 1015 n. 16; *Pataki,* 71 F.Supp.2d at 327.

Because the plaintiffs have not presented sufficient evidence to demonstrate white-bloc voting in Suffolk County Legislative elections, they have not shown a likelihood of success on the merits with respect to the third *Gingles* precondition.

### iv. As to the Totality of the Circumstances

■ With regard to the "totality of the circumstances," the plaintiffs must show that "its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). As noted earlier, the Senate Report accompanying the 1982 amendments to Section 2 of the Voting Rights Act identifies nine factors that may be pertinent to the totality of the circumstances analysis.

#### 1. The History of Official Discrimination

The first factor is "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority

group to register, to vote, or otherwise to participate in the democratic process." S. Rep. at 28, reprinted in 1982 U.S.C.C.A.N. at 206. In this regard, a plaintiff may not satisfy her burden with general allegations of racial discrimination. *See Reed v. Town of Babylon,* 914 F.Supp. 843, 885 (E.D.N.Y.1996). A plaintiff must show that Suffolk County has historically restricted the access of minorities to the political process. *Id.*

The plaintiffs presented no evidence of official discrimination in Suffolk County that affected minority groups' right to register, vote or otherwise participate in the democratic process. As such, this factor favors the defendants.

### 2. The Extent of Racially Polarized Voting

The second factor is "the extent to which voting in the elections of the state or political subdivision is racially polarized." S. Rep. at 29, reprinted in 1982 U.S.C.C.A.N. at 206. For purposes of this motion, Dr. Burton's testimony shows elections in Suffolk County, at least with respect to the New York State Senatorial races for districts 3, 4 and 8, are racially polarized. As such, this factor favors the plaintiffs.

### 3. The Use of Voting Practices that Enhance Discrimination

The third factor is "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." S. Rep. at 29, reprinted in 1982 U.S.C.C.A.N. at 206. The plaintiffs have presented no evidence of unusually large election districts, majority vote requirements or other voting practices that permit discrimination against minority groups. As such, this factor favors the defendants.

### 4. The Slating Process Access

The fourth factor is "whether members of the minority group have been denied access" to any candidate slating process. S. Rep. at 29, reprinted in 1982 U.S.C.C.A.N. at 206. This inquiry focuses on whether minority groups have been unable to get on the ballot. *See League of United Latin American Citizens,* 986 F.2d at 750. The plaintiffs have presented no evidence that minority candidates have been unable to get on the ballot for the Suffolk County Legislative elections. As such, this factor tilts in favor of the defendants.

### 5. The Socioeconomic Factors

The fifth factor is "the extent to which members of the minority group in the state or political subdivisions bear the effects of discrimination in such areas as education, employment, and health." S. Rep. at 29, reprinted in 1982 U.S.C.C.A.N. at 206. With this factor, the plaintiffs must show that as a result of prior discrimination, Hispanics suffer from lower socioeconomic conditions than whites. *See Gingles,* 478 U.S. at 69, 106 S.Ct. at 2776. The plaintiffs must also show a correlation between such lower socioeconomic factors and Hispanic voter participation. *Pataki,* 71 F.Supp.2d at 332.

The plaintiffs have made no showing in this case that there has been such discrimination in the area of education, employment or health. In addition, the plaintiffs have not established, in any manner, that Hispanics' lower socioeconomic condition in Suffolk County, if such is the case, has deprived them of their right to participate in legislative elections. As such, this factor favors the defendants.

### 6. The Subtle or Overt Racial Appeals

The sixth factor is "whether political campaigns have been characterized by overt or subtle racial appeals." S. Rep. at 29, reprinted in 1982 U.S.C.C.A.N. at 206. The plaintiffs have presented no evidence that any political campaigns for the Suffolk County Legislature have been marked with racial appeals against Hispanics or anyone else. As such, this factor favors the defendants.

### 7. The Success of the Minority Group in Public Office Elections

The seventh factor is "the extent to which members of the minority group have been elected to public office in the jurisdiction." S. Rep. at 29, reprinted in 1982 U.S.C.C.A.N. at 207. The plaintiffs have not presented any concrete evidence concerning the degree of success of Hispanics seeking public office in Suffolk County. On the other hand, the defendants have shown that the percentage of Hispanic voting age citizens in Suffolk County is 6.67%. Presently, there is one Hispanic legislator in Suffolk County which is 6% of the legislators. As such, the number of Hispanics in the Legislature measures close to the percentage of Hispanic voting age citizens. This factor favors the defendants.

### 8. The Elected Officials' Lack of Responsiveness

The eighth factor is "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." S. Rep. at 29, reprinted in 1982 U.S.C.C.A.N. at 207. The plaintiffs have not presented any evidence that elected officials in Suffolk County have failed to respond to the particularized needs of the Hispanic community. The plaintiffs' only evidence is that the Committee of Reap-

portionment for the Suffolk County Legislature and the Legislature did not respond to the PRLDEF's letters and proposed Latino redistricting plan. This alone, does not show a significant lack of responsiveness. As such, this factor is neutral at best.

### 9. The Policy underlying the State's Voting Practice

The ninth factor is "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S. Rep. at 29, reprinted in 1982 U.S.C.C.A.N. at 207. The plaintiffs have presented no evidence to show that Suffolk County's use of voting qualifications, prerequisites to voting or standard practices were tenuous. As such, this factor favors the defendants.

In sum, because 7 out of 9 of the "totality" factors favor the defendants, this supports the Court's finding that there is not a likelihood of success by the plaintiffs on the merits. Based on the foregoing, the Court finds that the plaintiffs have not presented sufficient evidence to show that they are likely to succeed on their claim under Section 2 of the Voting Rights Act.

### b. The Fourteenth Amendment Claim

The plaintiffs also contend that Resolution 402 violates the Fourteenth Amendment to the United States Constitution based upon two separate grounds: (1) that the legislative districts are unequal in population, namely that there is an improper deviation from the ideal population size; and (2) that communities were divided and the legislative districts were drawn predominately on account of race and to dilute minority voting. The Court will address each ground separately.

### i. As to Unequal Population

In *Voinovich v. Quilter*, 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), the Supreme Court stated that:

The Equal Protection Clause does require that electoral districts be 'of nearly equal population, so that each person's vote may be given equal weight in the election of representatives.' (citing *Connor [v. Finch]*, 431 U.S. [407], 416, 97 S.Ct. [1828], 1834, 97 S.Ct. 1828 [1977]). But the requirement is not an inflexible one. '[M]inor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State. Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State.' *Brown v. Thomson*, 462 U.S. 835, 842–843, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983) (internal quotation marks and citations omitted).

507 U.S. at 161, 113 S.Ct. at 1159.

 In evaluating a Fourteenth Amendment claim, these guidelines also apply: "more flexibility [is] constitutionally permissible with respect to state [or local] legislative reapportionment than in congressional redistricting." *Mahan v. Howell*, 410 U.S. 315, 321, 93 S.Ct. 979, 983, 35 L.Ed.2d 320 (1973). "[A] state's policy urged in justification of disparity in district population, however rational, cannot constitutionally be permitted to emasculate the goal of substantial equality." *Id.* at 326, 93 S.Ct. at 986. However, "slightly greater percentage deviations may be tolerable for local government apportionment schemes." *Abate v. Mundt*, 403 U.S. 182, 185, 91 S.Ct. 1904, 1907, 29 L.Ed.2d 399 (1971).

 To determine the "total deviation from population equality", a court must measure the difference in effective voting power between the most underrepresented voter and the most overrepresented voter. *Abate*, 403 U.S. at 184, 91 S.Ct. at 1906. Here, the "total deviation" from population equality is 10.25% (LD9, plus 6.56% + LD8, minus 3.69%). Tr. at 751. Because the total deviation from population equality is more than 10%, the plaintiffs have shown a *prima facie* case of discrimination that the state must justify. *See Brown*, 462 U.S. at 842–43, 103 S.Ct. at 2690.

With respect to justifications, there are a number of legislative policies that may justify a deviation in total population equality, namely assuring districts are compact; respecting municipal boundaries; preserving the cores of existing districts and preventing elections among incumbents. *See Karcher v. Daggett*, 462 U.S. 725, 740, 103 S.Ct. 2653, 2663, 77 L.Ed.2d 133 (1983) ("Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent[s].").

 The defendants presented the testimony of Legislator Andrew A. Crecca who drafted Resolution 402. The Court notes that Crecca was a very credible witness. Crecca cited a number of legislative policies that were considered in drafting Resolution 402. Those factors included maintaining previous Legislative District lines, political subdivisions (town lines), boundary lines and CDPs. He also testified

that he considered issues of race, ethnicity, compactness, contiguity and incumbency. Crecca gave specific examples in which Resolution 402 took these multiple factors into consideration.

Reviewing the former Legislative Districts, the Court finds that Resolution 402 achieves the factors cited by Crecca. The districts in Resolution 402 and in particular LD9 are compact and contiguous. They respect previous legislative district lines, boundaries and CDPs in most cases. As such, the defendants have presented sufficient proof to justify a deviation of 10.25% which the Court notes is not a major deviation. *See Abate*, 403 U.S. at 187, 91 S.Ct. at 1908 (approving population deviation of 11.9% for the local government in Rockland County, New York). Because the deviation is slightly above the level necessary to show a *prima facie* case and the defendants have presented legitimate justifications for this deviation, the Court finds that the plaintiffs have not shown a likelihood of success on the merits of their unequal population claim under the Fourteenth Amendment.

### ii. As to Legislative Districts based Predominately on Race

A plaintiff may challenge a redistricting plan under the Equal Protection Clause of the Fourteenth Amendment on the ground "that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Shaw v. Reno*, 509 U.S. 630, 649, 113 S.Ct. 2816, 2828, 125 L.Ed.2d 511 (1993). To make this showing, a plaintiff must establish that "race was the predominant factor motivating the legislature's decision," that is, "that the legislature subordinated traditional race-neutral districting principles, including but

not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller v. Johnson*, 515 U.S. 900, 916, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995). Where race is found to be the predominant, overriding factor in a redistricting legislation, then it must withstand "strict scrutiny," which requires the legislation to be "narrowly tailored to achieve a compelling state interest." *Id.* at 904, 115 S.Ct. at 2482.

The plaintiffs argue that LD15 and LD9 in Resolution 402 are based predominately on race. LD15 is made up of 34% African–American; 15% Hispanic and 51% Others. LD9 is made up of 45% Hispanic; 20% African–American and 35% Others.

■ As to LD15, Resolution 402 added the incorporated Village of Amityville in its entirety (a predominately white community) and deleted certain Election Districts (mixed white and Hispanic communities). This increased the population of LD15 to 98% of the ideal population figure. Crecca testified that he added the Village of Amityville to LD15 because the district was below the ideal population by about 5,000 inhabitants and that there were no significantly African–American communities surrounding this district. The plaintiffs' witness Jordan K. Wilson, Jr. conceded that he was not aware of any black communities that surround LD15 which could have been added to increase the population of the district. Moreover, the Court finds that LD15 is a compact legislative district. As such, the Court finds that the plaintiffs have not shown that LD15 was based predominately on race.

■ As to LD9, Resolution 402 splits the Brentwood and North Bay Shore communities. In addition, the split portions are detached from Central Islip, which remains intact. The plaintiffs have failed to present sufficient evidence to establish

that LD9 was based predominately on race. Significantly, the plaintiffs' expert, Dr. Beveridge testified that LD9 is sufficiently compact and does not pose the problems that the plaintiffs now claim. On direct examination, Dr. Beveridge testified as follows:

Q. With respect to the passed plan and the plaintiff's plan, did you do any compactness analysis?

A. Yes, I did.

Q. What is compactness?

A. Well, there is a variety of definitions of a district being compact.

Q. What did you use?

A. Well, there are actually, I mean there's six different compactness measures in the Maptitude for Redistricting. And on all of those measures, our district is slightly more compact than the other districts. Though I believe his honor is right: neither district is, you know, neither district is massive in terms of compactness. You know, you don't have like a Bush versus Vera situation or Shaw versus Reno situation. It is somewhat more compact.

Tr. at 126–27.

The plaintiffs argue that this case is similar to *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) and *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). In *Gomillion,* the city redrew the city limits of Tuskegee to remove almost all black voters and no white voters. 364 U.S. at 341, 81 S.Ct. at 127. The Supreme Court held that the city legislation was "solely concerned with segregating white and [African–American] citizens out of town so as to deprive them of their pre-existing municipal vote." *Id.* In *Shaw,* the State of North Carolina enacted a redistricting plan with a district that was hook shaped with finger-like extensions. 509 U.S. at 635, 113

S.Ct. at 2821. This district was compared to "a 'bug splattered on a windshield.' " *Id.* (quoting The Wall Street Journal, Feb. 4, 1992 at A14).

Resolution 402 does not present any of the problems found in *Gomillion* and *Shaw.* Here, LD9 is significantly more compact and contiguous than in those cases. LD9 has 45% Hispanic and 20% African–American. Based on the plaintiffs' own expert Dr. Burton who testified that Hispanics and African Americans vote in a politically cohesive fashion, at least with respect to certain State Senatorial races in Suffolk County, for all practical purposes LD9 forms a majority minority district.

In addition, Crecca testified that he developed Resolution 402 using traditional race-neutral districting principles which included compactness, contiguity, respect for political communities defined by actual shared interests and racial considerations. He also gave a logical reason for excising two and one half EDs in Brentwood, namely maintaining Central Islip intact together with the majority of the Brentwood community. As such, the Court finds that the plaintiffs have failed to establish that LD9 was based predominately on race. Accordingly, the plaintiffs have not presented sufficient evidence to show a likelihood of success on the merits of their claim that Resolution 402 was based predominately on race in violation of the Fourteenth Amendment.

Based on the foregoing, the plaintiffs have not shown a likelihood of succeeding on the merits of their claims under the Fourteenth Amendment to the United States Constitution.

### c. The Fifteenth Amendment Claim

The plaintiffs argue that Resolution 402 discriminates against them in violation of

the Fifteenth Amendment to the United States Constitution. This argument is without merit.

The Fifteenth Amendment provides that:

The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

U.S. Const. amend. XV, § 1. Where, as here, the plaintiffs claim vote dilution, it is uncertain whether the Fifteenth Amendment even applies. *See Voinovich,* 507 U.S. at 159, 113 S.Ct. at 1158 ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims.") (citing *Beer v. United States,* 425 U.S. 130, 142–143 n. 14, 96 S.Ct. 1357, 1364 n. 14, 47 L.Ed.2d 629 (1976)). The Supreme Court has stated that "we never have held any legislative apportionment inconsistent with the Fifteenth Amendment." *Id.* at 159, 113 S.Ct. at 1158. On the other hand, the Fifteenth Amendment applies to claims based on a denial of the right to vote. *See Baker v. Pataki,* 85 F.3d 919, 926 (2d Cir.1996) (establishing a vote denial claim under the Fifteenth Amendment where there is intentional discrimination on account of race, color, or previous condition of servitude).

■ The Court finds that the plaintiffs totally failed to establish a likelihood of success on their Fifteenth Amendment claim because they have not shown intentional discrimination with regard to the right to vote on the part of the defendants. *See Gold,* 101 F.3d at 800 (requiring discriminatory intent for constitutional claims). In addition, the plaintiffs have presented no authority to support the application of the Fifteenth Amendment to their vote dilution claim.

Accordingly, the Court finds that the plaintiffs have not shown that there is a likelihood of success on the merits of their Fifteenth Amendment claim.

### 3. Public Interest

Even if a plaintiff demonstrates a likelihood of success on the merits and irreparable harm, a court may deny injunctive relief when it weighs against the public interest as a result of an impending election. *See Diaz,* 932 F.Supp. at 468–69 (denying motion for a preliminary injunction seeking to prevent elections under challenged congressional redistricting plan). The Court need not address this factor because the plaintiffs have not shown a likelihood of success on the merits of any of their claims.

In this regard, the Court notes that during the evidentiary hearing the plaintiffs focused much of their attention on attempting to show that the Fisher Plan and the Beveridge Plan were "better" plans than the one adopted by the Legislature. However, this Court's role is not to consider which plan is "better" but rather it is limited to considering whether Resolution 402 complies with the requirements of the Voting Rights Act and the Constitution. *See Goosby v. Town Bd. of Town of Hempstead, New York,* 981 F.Supp. 751, 755 (E.D.N.Y.1997) ("It does not matter whether the court considers the proposal the 'best' plan, and it may not reject the plan to adopt what it considers to be a better one. Rather, the court's role is only to consider whether the plan proposed by the elected body is legally acceptable, *i.e.,* whether it comports with the requirements of the Voting Rights Act and the Constitution.") (citing *Upham v. Seamon,* 456 U.S. 37, 42–43, 102 S.Ct. 1518, 1521–22, 71 L.Ed.2d 725 (1982)).

### B. As to the Suspension of the Legislative Rules

■ The Court notes that the plaintiffs and intervenors suggested in their ques-

tioning of certain witnesses at the evidentiary hearing, that Resolution 402 was improperly enacted because the Legislature's rules were suspended by this Court. It was apparently inferred that the time exigencies permitted no public participation. This argument, if it be one, is without merit.

In the first instance, neither the plaintiffs nor the intervenors advanced this claim in their pleadings or papers. Second, the suspension of the Legislature's rules was done at the request of both the plaintiffs and the defendants. On May 14, 2003, the Court issued a written order—which the parties jointly prepared—directing the Legislature to hold a meeting on May 15, 2003 to consider and adopt a redistricting plan. That same day, the parties returned—together—requesting an amended written order which would suspend the Legislature's normal rules for the May 15, 2003 meeting. At the request of both parties, the Court issued the amended order. As such, the parties, one being the Legislature itself and the other being the plaintiffs, consented to the suspension of the Legislature's normal rules for that meeting. Third, the Legislature held public hearings and commission meeting over a two year period concerning the issue of redistricting without coming to any resolution. Fourth, the Court was advised that after the adoption of Resolution 402, it was subjected to a public hearing before the Suffolk County Executive and remains subject to a public petition. Fifth, the Fisher Plan and other plans were filed with the Legislature in late March 2003, *see* Tr. 933, and the parties advised the Court that the Legislature had held committee meetings and public hearings on the proposed plans. *See Montano v. Suffolk County Legislature*, 03CV1506 at 12–13 (E.D.N.Y. May 14, 2003). Accordingly, any argument that Resolution 402 was improperly enacted on the ground that the

Court suspended the Legislature's rules for the May 15, 2003 meeting is without merit.

## VII. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the plaintiffs' and the intervenors' motion to declare Resolution 402 in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution is **DENIED**; and it is further

**ORDERED**, that the motion to enjoin the defendants from holding any further legislative elections under Resolution 402 is **DENIED**; and it is further

**ORDERED**, that the motion for a preliminary injunction is **DENIED** in all respects; and it is further

**ORDERED**, that the motion to appoint a Special Master is **DENIED**.

**SO ORDERED.**